Submitted on record October 14, Accused suspended November 4, 1980

In re: Complaint as to the Conduct of
# HARRY A. ENGLISH,
*Accused.*
(OSB 1360, SC 27186)
618 P2d 1275

Harry A. English, pro se.

Richard E. Forcum and M. Max Merrill, Bend, for the Oregon State Bar.

PER CURIAM.

## PER CURIAM.

This is a disciplinary proceeding by the Oregon State Bar charging the Accused with (1) Failure to deposit $380 in funds belonging to a client in a client trust account; (2) Commingling in his personal account another $40 in funds belonging to a client; (3) Failing to pay a bill of $319 for services by a doctor as an expert witness, who then sued his client to collect the bill; (4) Neglecting a legal matter entrusted to him by unreasonable delay in the closing of an estate.[1]

The Trial Board found the Accused guilty of all four charges and recommended that the Accused "be suspended from the practice of law for a limited period of time" and "until he is able to demonstrate satisfactorily that he is capable of conducting his practice in such a manner as to avoid problems as demonstrated by this disciplinary proceeding." The Disciplinary Review Board concurred in the findings of guilt by the Trial Board and recommended that the Accused be suspended from the practice of law for "a minimum period of sixty days and thereafter until he meets the standards for reinstatement established by Section 18 of the Rules of Procedure of the Oregon State Bar."[2]

---

[1] The complaint also included the usual "cumulative" charge, which we find unnecessary to consider.

[2] Section 18 of the Rules of Procedure of the Oregon State Bar provides:

"Any person who has been an active member of the bar, but who has resigned (under Appendix B to these rules) or been disbarred, suspended for professional misconduct for a period of more than six months, suspended for any other reason, enrolled voluntarily as an inactive member for a period of more than six months or enrolled involuntarily as an inactive member, and who desires to be reinstated as an active member or to resume the practice of law in this state (except a person who has been suspended under section 4 of these rules solely for conviction of a misdemeanor involving moral turpitude or of a felony), may be reinstated, as an active member only, on application and compliance with the rules of the court and these rules of procedure and showing, to the satisfaction of the bar and the court, that he has the good moral character and general fitness required for admission to practice law in Oregon and that his resumption of the practice of law in this state will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive to the public interest. No such person shall resume the practice of law in this state without the recommendation of the bar, unless otherwise ordered by the court on its review of the action and recommendation of the bar. A person who has resigned (under Appenddix A to these rules) or been suspended for professional misconduct or enrolled voluntarily as an inactive member, for a period of six months or less, and against

By agreement between the Accused and counsel for the Oregon State Bar, this case was then submitted to this court for decision without briefs or oral argument.

*The First Charge.*

The facts relating to this charge, as found by the Trial Board, are as follows:

"Around November 1, 1974, the Accused obtained a money judgment in a personal injury-property damage case involving his client, Mrs. Marilyn Wisbeck. After the judgment, the Accused received, in behalf of his client, a draft from the defendant's insurance carrier. From those proceeds, the Accused withheld $380.13 for the purpose of paying off some of his client's medical and other bills incurred during the case.

"The Accused did not, at that time, have a clients' trust account. Instead, he placed his client's monies in a steel cash box in his office. The Accused testified that while in the cash box, Mrs. Wisbeck's funds were the only monies in it. There is no evidence that Mrs. Wisbeck did not ultimately receive the benefit of those monies, either indirectly by the payment of her bills or directly by way of payment from the Accused.

"It is the finding of the Trial Board that the Accused was in violation of Disciplinary Rule 9-102(A).[3] Having previously maintained a clients' trust account, there is no excuse for his not having one when handling Mrs. Wisbeck's monies. The fact that the funds were placed in a locked cash box does not satisfy the relevant Disciplinary Rule."

whom no complaints or charges of professional misconduct were pending and unresolved at the time of such resignation, suspension or voluntary enrollment, and against whom no complaints or charges of professional misconduct are pending and unresolved at the end of such six-month or lesser period, shall be reinstated automatically, without application, unless the court, in any suspension order, shall have directed otherwise. Any such reinstated member shall pay to the Oregon State Bar, prior to reinstatement, the active membership fee and client security fund assessment for the calendar year of reinstatement, less any active or inactive membership fee and client security fund assessment already paid to the Oregon State Bar for the calendar year of reinstatement."

[3] DR 9-102(A) provides:

"All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein * * *." (With two exceptions not relevant in this case.)

We have examined the record and agree with these findings.

## The Second Charge.

The facts relating to this charge, as found by the Trial Board, are as follows:

"From the total proceeds received from the Wisbeck judgment ($7,171.65), the Accused immediately deposited the sum of $2,900.00 into his personal account for payment of his attorney fees under a (40%) contingency fee agreement. The testimony is conflicting on the amount to which the Accused was entitled. It may have been $2,859.96 or it may have been $2,828.66. The first would result in a $40.04 overpayment to himself, the second, a $71.34 overpayment.

"In any event, both the Bar and the Accused agree that the Accused took more than that to which he was entitled from his client's monies. It is the finding of the Trial Board that the Accused was in violation of DR 9-102(A) by commingling her funds with his. The Accused explained the discrepancy as a 'clerical error', the result of his 'rounding off' the figures. However, the trial board does not see this as simply a matter of mathematical miscalculation on the part of the Accused or an inadvertent transposition of figures. It, more accurately, reflects a higher degree of inattention and carelessness on the part of the Accused. Nor do we believe that such inattentiveness to his client's interests can be excused simply because the amount of funds involved were insubstantial."

We also agree with these findings.

## The Third Charge.

The facts relating to this charge, as found by the Trial Board, are as follows:

"The Accused, in behalf of his client, incurred expert witness fees in connection with the prosecution of the Wisbeck case. After Dr. Anthony S. Wattleworth testified at the Wisbeck trial on October 1, 1974, the Accused was personally billed by the Bend Orthopedic and Fracture Clinic. That bill (in the sum of $319) was immediately due and payable. The Accused, shortly after the trial, received full payment on the Wisbeck judgment. Dr. Wattleworth's bill could have been paid from those monies.

"The Accused testified that he felt the physician's bill was too high. There were no prior discussions with the

expert witness regarding his fees. Subsequent to the receipt of the original bill, the Accused received other calls or bills from the clinic. The Accused, apparently, contacted the doctor's office only once regarding the bill. No effort was made by the Accused to contact the doctor personally.

"Mrs. Wisbeck also received bills from the clinic. She called the Accused approximately three times and the Accused assured her that he would pay the bills. The Accused was notified that his client would be sued if the bill was not paid. Mrs. Wisbeck was, in fact, sued for non-payment of Dr. Wattleworth's bill in February 1977. She notified the Accused. Finally, the Accused paid the bill.

"The Accused, in spite of retaining funds from the judgment to pay the doctor, in spite of telling his client that he would pay the bill, in spite of hearing that his client would be sued if the doctor's bill was not paid, did not timely pay the doctor's bill, either the disputed or undisputed part. Nor did the Accused make any reasonable effort to contact and negotiate with the doctor regarding the amount of the fee which the Accused felt was too high. Payment was not actually made for more than two years and three months after the debt was incurred, and not until the client was actually sued. The Trial Board finds that the delay was unconscionable and constitutes a violation of DR 6-101(A)(3)."[4]

We have also examined the record on this charge and agree with these findings.

*The Fourth Charge.*

The facts relating to this charge, as found by the Trial Board, are as follows:

"This matter involved the probate of the estate of one Etta M. Buckingham. Probate was initiated by the Accused on July 31, 1974, and as of October 29, 1979, the estate still had not been closed. The assets amounted to two small parcels of real property, approximately eight shares of stock in Pacific Power and Light Company, a few personal belongings and a small amount of cash. The total value of the estate was in the neighborhood of $16,000.00.

---

[4] DR 6-101 provides:

"(A) A lawyer shall not:

"* * * * *

"(3) Neglect a legal matter entrusted to him."

"The Accused has no real explanation as to why this estate had been open for such a long period other than to suggest that there had been some difficulty in accomplishing the transfer of the stock to the beneficiary of the estate. To what extent this difficulty may have been occasioned by the stock transfer agent or by Mr. English himself is unclear. In either event, it appears that by May of 1977, the transfer had been accomplished and, thus, from that time there would have been no reason why the estate could not immediately be closed. On November 19, 1979, the Trial Board was advised by Mr. English that, after approximately five and one-half years, this estate had finally been closed.

"It was the opinion of the Trial Board that the Accused's conduct regarding this estate constituted a violation of Disciplinary Rule 6-101(A)(3), which prohibits a lawyer from neglecting a legal matter entrusted to him. The Board was unconvinced that the simple matter of accomplishing the transfer of stock should have consumed so much time and/or that there should have been a further delay of over two years after the transfer.

"The Board noted that according to Exhibit 8, approximately 17 letters had been sent (by the court) to Mr. English during the course of the probate of this estate requesting that he take the necessary steps to bring the matter to a conclusion. It seems particularly incredible that the Accused would not have done whatever was necessary to resolve this problem until well over a year and a half from the time that formal charges had been brought against him by the Oregon State Bar."

Again, we have examined the record and agree with these findings. We believe, however, that the facts relating to the delay in the closing of this estate should be set forth in some further detail, including the facts relating to the letters from the court to the Accused and his lack of response to those letters.

On July 31, 1974, the Accused filed a petition for probate of the will of Etta M. Buckingham, naming the Accused as executor. On July 31, 1974, letters testamentary were issued naming the Accused as executor of the estate. By letters dated October 14, 1974, December 23, 1974, and February 14, 1975, the court requested that the Accused file an inventory. No inventory was filed by the

Accused until February 28, 1975, showing real and personal property with a total value of $13,611, including 15 shares of Pacific Power and Light common stock.

By letters dated April 7, 1975, June 9, 1975, July 3, 1975, August 5, 1975, and September 5, 1975, the Court requested that the Accused file income and inheritance tax "clearances" and a final accounting. Nothing in the court file indicates that the Accused responded to any of these letters. The next document filed by the Accused was an amended inventory on October 30, 1975, reassessing the value of the estate at $16,029.

By further letter dated January 16, 1976, the court requested the Accused to advise it when he expected to close the estate and the reasons for delay. Again, the Accused did not respond to either that letter or to a similar letter dated August 30, 1976, until October 4, 1976, when he informed the court that he was "waiting for stock transfers from New York," apparently involving the PP& L stock, and that the estate could then be closed quickly.

On March 21, 1977, the court again wrote to the Accused, asking to be advised whether the stock transfer had been received and whether the estate could be closed. Having received no response, the court on May 3, 1977, wrote a further letter to the Accused stating that unless he complied with that request within 10 days an order would be entered requiring the Accused to appear and show cause why he should not be removed as personal representative.

On May 12, 1977, the Accused responded to that letter by a letter to the court, stating that he had "finally" received the stock certificates that he had been trying to get for over a year and would then "take care of the distribution" and "finally close this long running estate."

Again, more months went by. On October 31, 1977, the court wrote again to the Accused, requesting him to either "close this estate within the next 30 days or advise in writing as to what is left before the estate can be closed." The Accused did not respond to that letter.

In December 1977 the court wrote a further letter to the Accused, saying that "unless I hear from you within

ten days * * * I intend to initiate a formal court order in this matter requiring your appearance." The Accused responded by letter dated December 14, 1977, saying that he was "working on the Buckingham Estate" and would have it ready to close "in the next day or so." On December 21, 1977, the Accused filed a "Statement in Lieu of Final Account—Short Form—Distributors Consenting," on a printed form, together with receipts from some of the beneficiaries of the will, an inheritance tax receipt and an income tax release from the Department of Revenue. On the same date a "Decree of Final Distribution" was entered by the court. On January 2, 1979, the Accused filed a "Final Report Showing Complete Distribution," with a further receipt. The Accused did not, however, submit a proposed order closing the estate.

On March 12, 1979, the court wrote to the Accused, saying that:

> "It appears that this estate can be closed as soon as the Department of Revenue files a new Certificate of Release. Please obtain that as soon as possible. Please contact me if you have any questions."

Apparently the previous tax release had by then expired.

On June 7, 1979, having received no response from the Accused, the court wrote to him again referring to its previous letter, asking if he had made application for the certificate of release and offering assistance in "getting them to issue a release." On August 6, 1979, the court wrote a similar letter to the Accused, again offering assistance and asking to be advised within thirty days "in writing, as to the status of this estate." Apparently, the Accused again did not respond to that letter, at least "in writing," as requested.

As of October 29, 1979, when the deposition of the Accused was taken in this proceeding, the estate had not yet been closed - over five years after it had been opened - despite not only the letters from the court to the Accused, but the service upon the Accused on or about December 15, 1978, of a complaint against him by the Oregon State Bar alleging, among other things, that his conduct in the handling of the Buckingham Estate "constituted unreasonable

delay and neglect of a legal matter entrusted to him in violation of Disciplinary Rule No. DR 6-101" - an allegation which the Accused had denied by his answer, filed on January 15, 1979. Indeed, the estate was not closed until November 9, 1979, ten days before the hearing of this proceeding before the Trial Board.

At that hearing the Accused testified that "there was quite a bit of activity in [the] Buckingham Estate right through the year '77"; that the estate "couldn't have been closed until the stock certificates were finally received" from the National City Bank in New York and then sent "to the power company for ultimate transfer" and that

"I don't think the time, during the time that a great majority of the letters were written from the court, that there was any unjustifiable delay."

and that:

"I don't see that there is anything previously wrong in anything that has been done."

With reference to the letters sent to him by the court, the Accused testified that he was not sure that he had received all of them; that those letters that he received from the court in 1979 "didn't register in my mind, at least when they came in," and that they may have been "just put aside because of the pressure."

In a "Statement in Opposition to Memorandum Opinion, Findings of Fact, Conclusions of Trial Board," filed with the Oregon State Bar prior to the opinion of the Disciplinary Review Board, the Accused states that:

"The Wisbeck matter of doctor bill was a result of procrastination rather than anything else. I considered the bill my own responsibility. As I explained in my deposition I was having at that time a serious to me tax problem and I was afraid any funds in any account, trust or otherwise, would be subject to attachment. * * * I never did intend to pocket any of the money or to commingle the same and the amount so found is infinitesimal. In fact, the Bar through its counsel stipulated that there was nothing intentional about this entire matter.

"The Buckingham estate accusation was made despite the fact that it was never even considered by a Grievance Committee at the local level. I raised this procedurally at the Trial Board hearing and I know of no determination on

that objection. I feel that is a procedural matter that was not resolved. The great part of the delay in closing that estate was caused by no fault of mine and I did everything possible to get the PP&L stock shares transferred. While I no longer have my file in my possession there are letters therein that attest to the fact of delays on the part of the transfer agent and not mine. My clients objected to the payment of fees as I requested and that prompted their original complaint to the Bar. After the stock transfer my relations with my clients were so bad that it was all I could do to be civil to them and I suppose my reaction was to do nothing and that I must admit was not the right thing to do. The letters from the Court I considered mostly form letters and this too was also a serious error on my part.

"I might also point out that these disciplinary proceedings have been going on for years through no fault of mine at great mental stress to me not to mention the financial burden placed upon me. * * *"

and that:

"I feel I have suffered enough in these matters. I have corrected whatever procedures need correcting in my office and such activities as I am accused of will never happen again."

Of the three charges relating to the *Wisbeck* case, the first two do not involve substantial amounts of money. They do, however, involve important rules of legal ethics. The maintenance by lawyers of trust accounts into which all monies belonging to clients shall be deposited, as required by DR 9-102(A), is a rule of the utmost importance for the protection of the public and one which must be strictly observed by all lawyers.[5] In this case the Accused failed to deposit $380 of his client's funds in a trust account, which he then did not have. In addition, by "rounding out" his contingent fee at $2,900, as compared with the proper 40% contingent fee in the sum of $2,828 on a judgment in the sum of $7,071, he also put in his personal account monies which belonged to his client.

If these were the only instances of misconduct by the Accused, a reprimand might be appropriate. In this case, however, the Accused was also guilty of two charges of even more serious misconduct, both involving violation

---

[5] See note 3, supra.

of DR 6-101(A)(3), which requires that "[a] lawyer shall not neglect a legal matter entrusted to him."

The failure of the Accused for more than two years to pay the bill of the doctor for testimony in the *Wisbeck* case - a bill which he acknowledged to be his own and for the payment of which he had withheld money received by him upon payment of the judgment in that case - resulted in his client being sued by the doctor for payment of that bill. Such misconduct by an attorney is so serious as to require more than a reprimand.

The misconduct of the Accused in his handling of the Buckingham estate was even more serious, in our opinion. The Accused was clearly guilty of unconscionable delay in his handling of that estate and his failure to close a routine estate for more than five years. His misconduct was made even more flagrant by his failure, if not refusal, to respond to repeated requests by the court for an explanation of the reasons for the delay in closing the estate. Indeed, the conduct of the Accused might well have justified contempt proceedings against him.

For many years it has been recognized that delays in litigation have been one of the two primary causes for public dissatisfaction with the administration of justice in America - the other primary cause of dissatisfaction being the cost of litigation. Not only judges, but also lawyers, have the responsibility to eliminate all unnecessary delays in litigation and to expedite the handling of all litigation so far as is reasonably possible. In *In re Kraus,* 289 Or 661, 616 P2d 1173 (1980), this court held (at 666) that neglect by an attorney in the handling of matters entrusted to him by his client may be grounds for suspension of the attorney from the practice of law, citing some of the previous decisions by this court to the same effect. *See also In re Holm,* 285 Or 189, 193-94, 590 P2d 233 (1979), and *In re Hedges,* 280 Or 155, 570 P2d 73 (1977), involving neglect by inexcusable delay. As pointed out by Holman, J., concurring in *In re Holm, supra,* at 194, the effect upon the client of procrastination and delay by an attorney may be as disastrous as if dishonesty were involved.

We are told by the Accused that he has "suffered enough in these matters"; that he has "corrected whatever

procedures need correcting," and that "such activities as I am accused of will never happen again."

It is important for lawyers to bear in mind, however, that the primary purpose of bar disciplinary proceedings is not to punish the lawyers involved, but to protect the public, not only by deterring other lawyers from engaging in misconduct, but by removing lawyers guilty of serious misconduct from the practice of law. *See In re Weinstein,* 254 Or 392, 394, 459 P2d 548 (1969), and *In re Moynihan,* 166 Or 200, 226, 111 P2d 96 (1941). In our opinion this is such a case.

For these reasons, and under the facts and circumstances of this case, we hold that the Accused shall be suspended from the practice of law for a period of three months and until he is able to show that he has the moral character and general fitness required for admission to practice law in Oregon, and that his resumption of the practice of law in this state will be neither detrimental to the integrity and standing of the bar or the administration of justice, nor subversive to the public interest, in accordance with Section 18 of the Rules of Procedure of the Oregon State Bar. The Oregon State Bar, as the prevailing party, is also awarded judgment against the Accused for its costs and disbursements.