Argued and submitted November 4, 1980, Accused reprimanded February 4, 1981

## In re Complaint as to the Conduct of

### PETER S. RUDIE,
*Accused.*

### (OSB 79-12, SC 27177)

622 P2d 1098

Paul M. Ferder, Salem, argued the cause for the accused. Roger S. Pearson, of Ferder, Ogdahl & Souther, Salem, filed the brief.

James R. Carskadon, Jr., of Redman, Carskadon & Knauss, Milwaukie, and Robert D. Herndon, of Ringle & Herndon, Gladstone, argued the cause and filed the brief for the Oregon State Bar.

Before Tongue, Presiding Justice, and Howell,* Lent, Linde, Peterson, and Tanzer, Justices.

PER CURIAM.

*Howell, J., retired November 30, 1980.

**PER CURIAM.**

The Oregon State Bar charged the accused, a member of the Bar, with disciplinary violations arising out of three separate episodes. The Bar's complaint stated eleven causes of complaint. Four of these were amended by leave of the trial board. With respect to four others the accused admitted the charge but pleaded mitigation. The trial board found the accused guilty of one of the other charges, the first. The Disciplinary Review Board found the accused not guilty of the first charge but found him guilty of the tenth charge. To avoid needless complexity, we deal with the episodes giving rise to the complaint and refer to the separate charges in context.

Two of the episodes arise from Mr. Rudie's actions in using *ex parte* orders of temporary guardianship as a means for his clients to take physical custody of young members of their families who had joined certain groups or organizations, in order to persuade the individual to leave the organization. These are the Brightman and Blackman cases. The third episode involved a divorce matter, the Owre case, in which the accused is charged with neglect. Finally, a group of four causes of complaint charged the accused with failing to respond to the Bar's inquiries concerning complaints against him.

I. *The Brightman Case*

Mr. Rudie became a member of the Bar in 1975. According to his testimony before the trial board, during the immediately preceding years Rudie's brother had become a member of an organization known as the Unification Church and broken off contact with his family for an extended period before breaking away from that organization in New York and returning home. As a result of his brother's experiences Rudie developed a strong aversion to the practices of religious cults that recruit young adults for full-time, total immersion in the cult's activities, including group living, travel, and fundraising, and often isolating them from their families and former associates; and he also became interested in the legal problem facing parents who sought ways to break through this isolation. Having learned that lawyers in other states had made use of guardianships or conservatorships for this purpose, he began pursuing this technique in Oregon.

In 1979 the accused was retained by Donald Brightman, whose daughter, Lark Brightman, had left her apartment and university and had joined the Unification Church. The father had last seen her at a Portland, Oregon, house belonging to that group, but before the appointed time for a second meeting she had left this house.

Mr. Brightman employed a private detective agency, U. S. Protective Service. He asked the accused to proceed with plans to petition for a temporary guardianship of Lark, who was about 23 years old. Upon information suggesting that Lark was with a group at a camp in Clatsop county, the accused decided to file the petition in the circuit court for that county, in Astoria, Oregon. After an *ex parte* hearing on March 16, 1979, Judge Edison signed an order appointing Donald Brightman the temporary guardian of Lark Brightman "for a period of thirty days or until further order." The order further empowered Donald Brightman to take Lark Brightman into his custody "to have the Ward counselled, examined, and treated by persons including but not limited to physicians, psychiatrists, psychologists, social workers, and lay persons" and to keep her in custody "even in the event said Ward wishes to leave said custody." The order set a further hearing for April 10, 1979, when the guardian was ordered to produce the ward in court and the ward was directed to show cause why the guardianship should not be made permanent.

The legality of this procedure as such is not before us, and we express no opinion on it. The Bar's complaint stated three charges arising from the proceeding. One charge was that the accused knowingly fabricated and used false evidence in the proceeding. The trial board "dismissed" this charge for lack of proof, and the Disciplinary Review Board agreed. The Bar does not press this charge in its brief. We find the accused not guilty of this cause of complaint.

■ Two other charges concern the accused's conduct after he obtained the temporary guardianship order for Mr. Brightman. The course of events may be summarized as follows.

Upon returning from the court to an Astoria motel, Mr. Rudie found information that Lark Brightman was not

in Clatsop county but at a camp near Ocean Park, Washington. He testified that, without attempting to inform or consult Judge Edison, "[w]e headed right straight for Washington . . . to see if I could catch a judge or some judicial or law enforcement authority in before the business day expired." Rudie had given some attention to the question of the legal status of an Oregon order in that state. That evening, the group, which included Mr. Brightman and two men from the detective agency, Landon and VanMeter, met in Long Beach, Washington, with a group of law enforcement officials to discuss possible action under the Oregon court order in Washington.

The following morning the group drove to the camp at Ocean Park in a van belonging to U. S. Protective Service. Upon seeing Lark Brightman enter a mess hall, Landon and VanMeter went after her while Rudie and Brightman waited in the back of the van with the engine running. There is evidence that the private investigators pretended to be police officers arresting Miss Brightman for burglary, and they handcuffed her. While returning with her from the mess hall, Landon and VanMeter got into an altercation with a young member of the Unification Church, later identified as Dominic Gutierrez, who tried to prevent her removal from the camp. The accused testified that Landon "pushed Gutierrez to the ground a few times," and he and VanMeter sprayed "a Mace-like substance" into Gutierrez's face. The group started away from the camp in the van, Landon attempting to drive although partially disabled by some of the spray and by Gutierrez still clinging to his arm and the window of the vehicle, VanMeter steering from the passenger side, and Rudie in the back with the struggling Lark Brightman and her father. Gutierrez succeeded in forcing the van off the road into a ditch. At some point VanMeter threatened Gutierrez with a pistol, and the fight continued in the road, ending to Gutierrez's disadvantage. The men pushed the van back on the road and drove to Long Beach, followed by one or two vehicles occupied by members of the Unification Church.

In Long Beach, the Brightman group reported the preceding events to police and sheriff's officers, and so did the group from the Unification Church. Thereafter they

were also interviewed by the local prosecuting attorney. The prosecuting attorney and the accused got into an argument about the legality of the Brightman group's actions in Washington State before the Oregon court order was registered in that state, the district attorney threatening to charge Rudie with kidnapping and Rudie asserting that the district attorney would be "in trouble" for interfering with Brightman's enforcement of the Oregon order. The prosecuting attorney arranged for Lark Brightman to stay overnight at the home of a police matron in Long Beach. According to his testimony, the Washington superior court subsequently agreed informally with his position that the unregistered Oregon order gave the temporary custodian no legal powers in Washington.

The accused's role in the foregoing events led to the first and second cause of the Bar's complaint. Leaving aside conclusory allegations, the first cause charged the accused with conduct prejudicial to the administration of justice and specifically with failing and neglecting to uphold the laws of the State of Washington. The second charged that the accused knowingly counseled and participated in illegal conduct in crossing into Washington to execute the Oregon order "when the accused knew or in the exercise of reasonable professional judgment should have known" that the order was unenforceable in Washington.

The trial board found the accused guilty on the first cause of complaint. The board rested this conclusion on the grounds that the accused knew the likelihood of physical resistance and violence in the seizure of Lark Brightman and nevertheless participated in the seizure, and also that by his participation in the events the accused disqualified himself as counsel for Mr. Brightman "vis-a-vis his position as a potential witness" in the guardianship proceeding. The Disciplinary Review Board rejected this conclusion. It found no disciplinary rule forbidding a lawyer's presence in phases of a professional engagement where physical force and resistance may be expected.

On the record before us we agree with the Disciplinary Review Board. Force, resistance, and potential violence can be more or less predictable in situations ranging from everyday law enforcement, through self-help repossessions, to picket lines or civil rights marches. The ethical

question hinges not on the lawyer's presence at the scene but on the nature of his advice and conduct. A profession can applaud an assistant attorney general who leads black students through a hostile crowd to a segregated high school without similarly applauding another attorney who personally directs a raid for the forcible capture of an innocent person in the name of law enforcement. But the Bar did not show that this occurred here.

Although the violence at the camp was not unexpected, there is no showing that the accused either directed or personally joined in the manner in which the private agents seized Miss Brightman. If he directed or approved improper acts by the agents, his professional responsibility would not depend on his presence or absence. His own testimony is that he went with the group to forestall or deal with legal difficulties in Washington. In itself that is a legitimate purpose. The accused in fact met with Washington law enforcement personnel, including a local city attorney, the night before the seizure at the camp, and he later sought to defend the legality of the group's actions when dealing with the authorities in Long Beach.

The crux of the first and second charges thus becomes whether the accused knew or as a competent lawyer should have known that the Oregon order of temporary custodianship had no legal effect in Washington and could not justify the use of force in that state. If this were demonstrated, the precaution of informing the Washington sheriffs and police officers of the intended seizure would be no defense. But the Bar produced no evidence that the accused knew or should have known that an involuntary seizure of Miss Brightman in Washington before the order was registered there would be unauthorized. The accused sought to convince the Washington prosecutor that the Oregon order itself was entitled to full faith and credit in Washington. We state no view on the merits of that position, but the Bar has not shown that it was advanced in pretense or bad faith, or in culpable ignorance. Accordingly, we agree with the Disciplinary Review Board that the Bar's first and second causes of complaint were not proved.

## II. *The Blackman Case*

A year earlier, in April 1978, the accused was retained by Mr. Martin Blackman, a New York attorney, to

obtain guardianship of his 23-year-old son William Blackman, who had joined a group organized as the International Society of Krishna Consciousness and sometimes referred to as the Krishna Society or Hare Krishna. The issues arising out of this episode, as framed by the Bar's fifth, sixth, and seventh causes of complaint, are whether the accused acted unprofessionally, first by seeking the guardianship order in the circuit court for Marion county, then by misrepresenting his intention to bring the ward before the court, and later by making a certain assertion in argument to the court.

The following appears from the transcript of four hearings before the Marion county circuit court, which were made part of the record in the disciplinary proceeding, and from the accused's testimony in this proceeding.

At the first hearing, on April 6, 1978, Martin Blackman described certain changes in his son's appearance and demeanor during the preceding years of the son's membership in the Krishna Society that caused the father concern for the son's physical and mental wellbeing. He testified that so far as he knew his son had lived in Oregon since 1975. The son had last met his family in Portland in February, 1978, about two months before the hearing.

The guardianship was requested under ORS 126.100 to ORS 126.143.[1] The statute places the venue for guardianship proceedings "in the place where the incapacitated person resides or is present." ORS 126.100. Mr. Rudie elicited no testimony that William Blackman had been known to be in any other place in Oregon than Portland. From the father's testimony it appears that William lived in a house in Portland with other young members of the society and went "from place to place [to] shopping centers or schools or public events . . . and they would solicit funds." Thereafter, in response to questioning by the court, Mr. Blackman testified:

---

[1] With respect to appointment of a temporary guardian in an *ex parte* proceeding on grounds of "emergency" ORS 126.133 provides:

"If the court finds that an emergency exists and no guardian has been appointed or that a guardian is not effectively performing his duties or that

"Q Where has he been?

"A He's been pretty much around the state. In fact, when I said he's been in Oregon, he always seems to return to Oregon. He has been outside of Oregon. In other words, he has traveled, perambulated around the country.

"Q Where was he when you had your visit in February?

"A We saw him in Portland."

This was the extent of the evidence bearing on venue.

The Bar maintains that on the facts of record, the accused knew that the petition for guardianship should have been filed in Multnomah county and by filing it in Marion county exceeded the bounds of representation imposed by DR 7-102(A).[2] The trial board made no finding concerning this charge beyond listing it among those "dismissed" as unproven. The Disciplinary Review Board found it "probable that the Accused knew the ward was much more apt to be present in Multnomah county than in Marion County at the time the ex parte order was applied for in Marion County." However, the board assumed that "it is improper to file a proceeding in the county where venue is wrong [only] when it will intentionally harass the opponent or will have such an effect as a practical matter," and that improper venue cannot inconvenience a respondent in an *ex parte* proceeding.

---

the welfare of the incapacitated person requires immediate action, the court may, with or without notice, appoint a temporary guardian for the incapacitated person for a specified period and specified purpose. A temporary guardian has the care and custody of the ward for the purpose so specified. The authority of the permanent guardian previously appointed by the court is suspended while the temporary guardian has authority. A temporary guardian may be removed at any time and shall make any report the court requires. ORS 126.003 to 126.143 apply to temporary guardians."

[2] DR 7-102 (A):

"(A)In his representation of a client, a lawyer shall not:
    (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

    (2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.

The requirement of intent to harass or prejudice a respondent might have bearing if professional misconduct is charged under DR 7-102(A)(1), *supra* note 2. But it is not an element under other paragraphs of the rule, which state obligations to the law and the administration of justice beyond protecting the interests of an opposing party. Thus there is at least as much obligation, under paragraphs (3) and (5), not to misstate or conceal facts or law in order to obtain venue in an *ex parte* proceeding, in which no one will appear to challenge venue and the court must be able to count on the professional trustworthiness of the attorney seeking the *ex parte* order. Moreover, the execution of an improperly obtained *ex parte* order obviously is a serious imposition on the ward whether or not the venue itself is.

In response the accused makes two arguments. One is that because members of Krishna groups go from place to place to raise funds or recruit members, William Blackman was as likely to be in Marion county as in any other county. Taken to its logical conclusion, this argument would justify the accused in seeking an *ex parte* guardianship order in any circuit court he found advantageous or convenient. (Mr. Rudie's office is in Salem, the Marion county seat.) However, the accused and his client knew where William lived in Portland. The father had visited him there. The accused had no reason to consider the chance that William at the time of the petition was present in Marion county, as required by ORS 126.100, to be more than one of many possibilities. William was in fact found and taken into custody in Portland.

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule."

Second, the accused argues that he made no misrepresentation of fact to the circuit court but candidly discussed the matter of venue with the circuit judge "both in chambers and on the record." We have quoted above what little the transcript of the guardianship hearing contains with respect to venue in that court. But this case is not a challenge to the guardianship order; it is a complaint of unprofessional conduct of a kind to which the off-the-record discussion may well be pertinent. We do not know what discussions concerning venue occurred in chambers. The Bar did not call the circuit judge as a witness. This leaves the charge of a knowingly misleading representation too much to inference from an incomplete record. Under the circumstances, we agree with the trial board that this cause of complaint was not proved.

■ We reach the same conclusion with respect to the charge that the accused misrepresented his intention to produce the ward in court, as required under the temporary guardianship order.

The court had reduced the length of the temporary guardianship asked for because it believed that a medical and psychological examination could be conducted in Oregon rather than requiring one of the few "experts" recognized as such by the accused.[3] The order actually signed on

---

[3] The court stated its intention to limit the temporary guardianship to examination of the ward rather than persuasion or "deprogramming":

"THE COURT: I'm not sure I need a detailed analysis or complete work-up but under Oregon law a medical doctor, licensed to practice, is qualified to give opinions as to psychiatric matters. Maybe your medical doctor would be one that would be so qualified. I would hesitate to accept that there is only a half-dozen people in this country that can examine a boy like the one we are talking about and make at least some sort of a valid preliminary judgment as to his psychological state. . . .

"But you see my concern about subjecting somebody to deprogramming without giving them a chance to come in and say I don't want it or without establishing by other than biased, maybe best-intentioned, but nonetheless biased, testimony. And I feel that I have to be careful about the exercise of the Court's power to go much farther than that.

. . . .

"I'll give you an order of temporary guardianship with the right of custody for a period of ten days. The authority will be only to remove him from the influence of the cult and to give him a chance to quiet down and to subject him to as reasonable and as non-traumatic as possible medical and

April 6, 1978, empowered the father, as temporary guardian, to "have the Ward counselled, examined, and treated by persons including but not limited to physicians, psychiatrists, psychologists, social workers, *and lay persons"* (emphasis added), and set a show cause hearing either ten days after the guardian obtained custody or on April 26. In fact, Mr. Blackman took his son with him to New York, and they did not return on the date set in the order. At a subsequent hearing the circuit judge seriously considered contempt proceedings against Blackman and Rudie. Mr. Rudie took the position that he had advised his client, who was himself a lawyer, of the court's order and was not personally responsible to secure his and the ward's appearance. Eventually the Blackmans did return to court, and the court did not press the contempt charge.

The disciplinary complaint, however, is that the accused deceived the court because he never intended or expected to bring William before the court until William had been subjected to "deprogramming." The inclusion of counseling or treatment by "lay persons" in the order submitted to the court suggests that not all the "experts" were to be physicians or psychologists, whose availability in Oregon for diagnostic purposes the court had stressed before signing the temporary *ex parte* order. William Blackman was not examined in Oregon, as the court intended.

The accused testified that he "suspected" that Mr. Blackman would take his son out of the state, but "there was nothing in the order to prevent that." In fact, he accompanied the Blackmans to San Diego, California. The question is whether the Bar proved that the accused expected and intended this course of events when he obtained the *ex parte* order.

We recognize that direct testimony of intentional misrepresentation is rare and that such a finding often must rest on compelling inferences from the circumstances.

_____

psychiatric or psychological examinations. I think he should be back in court within ten days, either to tell me that he voluntarily wants to go along with this or that you can establish with additional evidence the need for continuation of this, in spite of his objections."

From Mr. Rudie's own testimony, he felt no obligation to disclose his and Mr. Blackman's plans. He said: "The Court never asked me. I did not volunteer the information. At the time we presented the petition we didn't know what would happen." We do not commend that as a model of candor. But it falls short of knowing misrepresentation as to William's return on the date set in the court's order. We do not find this accusation proven by clear and convincing evidence.

■ A final charge in the Blackman case is that the accused improperly expressed a personal view of a factual issue and of the justness of a cause, contrary to DR 7-106(C).[4] In a hearing on April 14 at which the propriety of the *ex parte* order was challenged by an attorney for the International Society of Krishna Consciousness, the accused stated in the course of argument: "If this guardianship is dismissed I have reason to believe that Mr. and Mrs. Blackman will never see their son again, in court or out of court." The Bar points to this as a statement by counsel of personal knowledge a fact when he was not testifying as a witness. The accused claims that there was a foundation for

---

[4] DR 7-106(C):

"(C)In appearing in his professional capacity before a tribunal, a lawyer shall not:

(1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence.

(2) Ask any question that he has no reasonable basis to believe is relevant to the case and that is intended to degrade a witness or other person.

(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

(4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.

(5) Fail to comply with known local customs of courtesy or practice of the bar or a particular tribunal without giving to opposing counsel timely notice of his intent not to comply.

(6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

(7) Intentionally or habitually violate any established rule of procedure or of evidence."

it in testimony at the earlier hearing, but that is an afterthought; he did not refer to any evidence when he made the statement. The statement was one of prediction rather than of a past or present fact, and it may be that the strictures of DR 7-106 are not infrequently overlooked in oral argument, which does not excuse the breach. However, in the actual context of these particular hearings the assertion by counsel could not mislead the court, and we shall disregard this breach as *de minimis.*

### III. *The Owre Case*

■     In January, 1978, the accused was consulted by Mrs. Ann Owre, whose husband had filed a complaint seeking dissolution of the marriage. Mrs. Owre believed that the accused was "working on the case." She testified that one day she read in the paper that she was divorced. The husband's attorney had taken a default decree, apparently without informing Mr. Rudie. Rudie assured Mrs. Owre that the default could be set aside, but after further discussion they decided to accept the property distribution made in the decree. This involved obtaining the husband's signature to certain title documents which Mrs. Owre gave the accused for that purpose. After several months the accused had not completed that transaction, and Mrs. Owre left a note at his office asking him to turn the file over to another attorney. This had not yet been done at the time of the disciplinary hearing.

The Bar's tenth cause of complaint charged the accused with neglecting a legal matter entrusted to him. DR 6-101(A)(3). The accused did not contradict the essential facts, but he explained the latter phases of the delay by the fact that in September, 1978, his parents were killed in an airplane crash, leaving him too preoccupied with family affairs and emotionally incapacitated to function effectively in his practice.

The trial board made no statement whatever concerning the tenth cause of complaint. The Disciplinary Review Board stated that it viewed the failure to respond to Mrs. Owre "as a serious matter" despite the mitigating circumstances. Again, we agree with the Disciplinary Review Board. *See In re Geurts,* 290 Or 241, 620 P2d

1373 (1980); *In re English,* 290 Or 113, 618 P2d 1275 (1980); *In re Kraus,* 289 Or 661, 616 P2d 1173 (1980); *In re Holm,* 285 Or 189, 590 P2d 233 (1979); *In re Kneeland,* 281 Or 317, 574 P2d 324 (1978).

## IV. *Failure to Respond to the Bar*

The fourth, eighth, ninth, and eleventh causes of complaint charged the accused with failing to respond to inquiries from the Bar enclosing complaints the Bar had received in the Brightman, Blackman, and Owre episodes and in one unrelated matter. Before the trial board and the Disciplinary Review Board the accused stipulated to these accusations, subject to the same extenuating reasons mentioned in the Owre case. The Disciplinary Review Board took this failure to respond into account in reaching a recommendation that the accused be disciplined by a 30-day suspension from practice.

In *In re Kneeland, supra,* this court noted that it "has previously had occasion to express its disapproval of inexcusable delay by an attorney in responding to requests by clients and by the Oregon State Bar," including requests by the Bar for information relating to clients' complaints. 281 Or at 322. We recently repeated that disapproval, stating that "[r]eadiness to accept the obligation to account for one's performance is an important element of professionalism." *In re Geurts, supra,* 290 Or at 248. However, we continued by noting that failure to respond to inquiries by the Bar is not itself clearly condemned by a disciplinary rule, independent of what bearing it may have on the matter under inquiry. Accordingly, as in *Geurts,* we impose no additional sanction for these causes of complaint.

### Conclusion

The Disciplinary Review Board recommended a 30-day suspension based on violations of the tenth cause of complaint, neglect in responding to Mrs. Owre's requests, and of the four charges concerning failure to respond to the Bar's inquiries. Upon our own examination of the record we generally agree with the Disciplinary Review Board's conclusions. Because we exclude the last-mentioned charges from consideration, however, we believe that the appropriate discipline is a public reprimand. This opinion will serve as the reprimand.

Accused reprimanded. The Oregon State Bar is awarded judgment against the accused for its costs and disbursements.