In re Complaint as to the Conduct of
# DENNIS ODMAN,
*Accused.*

(OSB 81-30; SC S30429)

687 P2d 153

Don H. Marmaduke, Portland, argued the cause for the accused. With him on the briefs were Barbee B. Lyon and Tonkon, Torp, Galen, Marmaduke & Booth, Portland.

Morton A. Winkel and Stephen F. Crew, Portland, argued the cause and filed the brief for the Oregon State Bar.

## PER CURIAM

This is a disciplinary matter in which the accused, Dennis Odman, was charged with violating three disciplinary rules in connection with his representation of the estate of Mr. Echeverria: DR 5-105 (conflict of interest);[1] DR 6-101(A)(3) (neglect of a legal matter); and DR 6-101(A)(1) (lack of competence). The Trial Board found the accused not guilty of the conflict of interest and lack of competence charges, but guilty of neglect of a legal matter. The Disciplinary Review Board found him guilty of all three charges and recommended this court publicly reprimand the accused. We review the facts de novo and find as follows.

The accused and the firm Haley & Haley had been helping Mr. Echeverria obtain a small business loan. On October 2, 1977, Mr. Echeverria was murdered. Two days later the firm filed a petition for probate of the will. Robert K. Haley, an associate of the accused, was named as personal representative and a $100,000 bond was filed.

On November 20, 1977, a document entitled "final accounting" was filed along with an affidavit stating Robert K. Haley's desire that the accused be substituted for him as personal representative. The probate court refused to sign the order approving the final accounting because no inventory had been filed and because the accounting did not contain itemized receipts and disbursements. The court also refused to substitute personal representatives.

In the fall of 1977, the accused assumed full responsibility for the estate as attorney.

---

[1] *In re Kinsey,* 294 Or 554, 557, 660 P2d 660 (1983), explains the use of the term "conflict of interest" as follows:

"Oregon's Ethical Considerations and Disciplinary Rules do not use the terminology 'conflicts of interest.' However, EC 5-18, in discussing a corporation attorney and his allegiance to the corporation, utilizes the term 'differing interests.' The ABA provides guidance by defining 'differing interests':

' "Differing interests" include every interest that will adversely affect either the judgment or the loyalty of a lawyer to a client, whether it be a conflicting, inconsistent, diverse, or other interest.' ABA Code of Professional Responsibility, Definition 1, p 454 (July, 1969).'

The 'differing interests' referred to in Oregon's EC 5-18 are the same as the ABA's definition of 'differing interests' and hold that there is no distinguishable difference between 'conflicting interests' and 'differing interests.' "

On January 27, 1978, an "inventory" was filed which stated, in its entirety: "Assets: None." At the same time, the personal representative, Robert Haley, petitioned for a reduction of bond stating that the value of the estate, consisting of two restaurants, was approximately $50,000 and the debts of the estate were in excess of $110,000.

On April 3, 1978, an earnest money agreement was executed for the sale of one of the restaurants. The $10,000 sales price was delivered to the accused and he deposited the sum in his noninterest-bearing clients' trust account. The sale of the restaurant was conditioned upon obtaining the probate court's consent. The amount remained in that account for almost four years.

Mr. Russell Lunning had a perfected security interest of about $19,000 in the assets of the restaurant sold. The Internal Revenue Service (IRS) had filed a lien for unpaid withholding taxes concerning operation of the restaurant businesses. Lunning was represented by attorney Kenneth Montgomery prior to and after Mr. Echeverria's death. Montgomery represented Lunning throughout priority negotiations between Lunning and the IRS. These negotiations between Lunning and the IRS took place during 1978 and 1979 and on August 22, 1979, an agreement was reached. On August 30, 1979, the accused informed Montgomery that the accused would immediately file a final accounting and a check would issue to Lunning after the period allowed by law for objections to the final accounting elapsed.

While negotiations between Lunning and the IRS proceeded, other claims against the estate were made. The Oregon Employment Division and Marion County filed liens for unpaid taxes. The accused and Lunning's attorney, Montgomery, immediately determined that the IRS and Lunning's claims had priority over these other claims. During the same time, the accused was notified that Echeverria's car, estimated to be worth $100, was being held under a possessory lien for $1,057. In several communications after August, 1978, with the court and other persons, the accused said that the estate would be closed as soon as the automobile was sold.

On February 14, 1979, the probate judge issued an order to show cause why the personal representative should not be removed. This citation was served six times upon the

accused during the next year and each time the accused obtained an extension of time in which to appear.

On January 21, 1980, the accused filed another inventory showing the assets of the estate to be $10,500 ($10,145.40 in cash and one automobile). In March, 1980, the accused submitted an order for approval of the sale of the restaurant. This occurred approximately two years after the earnest money agreement was executed and the sales price delivered to the accused.

In April, 1980, the accused became an associate in attorney Montgomery's office. At the time of the association, the accused was still acting as the estate's attorney and Montgomery was still Lunning's attorney. The Employment Division's and Marion County's claims were still pending at this time. The accused remained with the firm until April, 1981.

On February 27, 1981, the accused was substituted as personal representative for Robert K. Haley. In March, 1981, an inheritance tax return was filed, however the accused used the wrong form. The Department of Revenue supplied the proper form and the form was filed in April. An application for an income tax release was not filed until March, 1981. A request for final audit of decedent's Oregon individual tax return was filed in November, 1980. The Department of Revenue issued an inheritance tax release in May, 1981. In July, 1981, the accused filed a "final accounting" but failed to send the notices required by statute. In March, 1982, the accused filed a petition to remove himself as personal representative and had attorney Robert Groce substituted. By October, 1982, Groce closed the estate and distributed the monies to Lunning and the IRS pursuant to their agreement.

As to the first charge, the relevant portions of DR 5-105 provide:

"(B)   A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C)   In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each

consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

This court said in *In re Porter,* 283 Or 517, 523, 584 P2d 744 (1978):

"* * * [I]f the representation of multiple clients is such that the lawyer's independent professional judgment on behalf of one client *will be* adversely affected (an 'actual' conflict), or *is likely to be* adversely affected (a 'potential' conflict), the representation is improper unless the exception provided in DR 5-105(C) applies." (Original emphasis.)

We find that a potential conflict of interest existed in this case. At the time the accused associated with Montgomery, the accused knew he was acting as attorney for the estate and there were claims pending. He knew Montgomery was acting as Lunning's attorney in settling Lunning's security interest with the estate. He should have known that any negotiations or settlement of the pending liens could affect the amount of Lunning's recovery. The fact that Lunning and the IRS had reached an agreement did not remove the potential for conflict of interest. There being a potential conflict, the accused did not comply with the requirements of DR 5-105(C) for full disclosure and consent.

Turning to the second charge, DR 6-101(A)(3) states:

"(A)    A lawyer shall not:

"* * * * *

"(3)    Neglect a legal matter entrusted to him."

There is no doubt that the accused neglected a legal matter entrusted to him. Some of the salient examples of the accused's neglect are that after four-and-one-half years the accused failed to close an insolvent estate, he failed to file an inheritance tax return within nine months of decedent's death, and when the return was filed, three-and-one-half years after decedent's death, the wrong form was submitted. Furthermore, no annual accounting was filed until January, 1980, although probate began in October, 1977. The order approving the sale of one of the restaurants was not presented to the probate judge until two years after the sale. The proceeds of that sale remained in the accused's trust account for four years without earning interest. The Disciplinary

Review Board stated "it does not take an expert in probate law to determine that the Accused's work was woefully inadequate from the original initiation of the probate proceedings in 1977 until his being relieved by Attorney Groce in 1982." We agree with the Disciplinary Review Board that the accused violated DR 6-101(A)(3). *See, In re Loew,* 296 Or 328, 676 P2d 294 (1984); *In re Rudie,* 290 Or 471, 622 P2d 1098 (1981); *In re Geurts,* 290 Or 241, 620 P2d 1373 (1980).

Finally, the accused was charged with violating DR 6-101(A)(1), which states:

"(A)   A lawyer shall not:

"(1)   Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it."

A review of the facts of this case shows improperly filed and late accountings, inventories and inheritance tax returns. The accused did not know the basic steps in administering and closing the decedent's insolvent estate.

Ethical Consideration 6-3 is informative. It provides:

"While the licensing of a lawyer is evidence that he has met the standards then prevailing for admission to the bar, a lawyer generally should not accept employment in any area of the law in which he is not qualified. However, he may accept such employment if in good faith he expects to become qualified through study and investigation, as long as such preparation would not result in unreasonable delay or expense to his client. Proper preparation and representation may require the association by the lawyer of professionals in other disciplines. A lawyer offered employment in a matter in which he is not and does not expect to become so qualified should either decline the employment or, with the consent of his client, accept the employment and associate a laywer who is competent in the matter."

The accused acknowledged that he did not do estate work. He did not undertake steps to become qualified in the area and his associates were recent bar admittees who also had no experience in probate law. He did associate with an attorney who had probate experience, however that did not occur until mid-1981. The accused is guilty of violating DR 6-101(A)(1). *Cf., In re Chambers,* 292 Or 670, 642 P2d 286 (1982).

This case is a sad example of a lawyer who, although acting in good faith, failed to discharge basic professional responsibilities. This lawyer worked off and on for this estate over a period of years with no fee or expectation of a fee and, at one time, even tried to keep one of the restaurants going by acting as a pinch-hit cook without pay. However, he nevertheless failed to take the routine steps to close out a simple legal matter in a timely fashion.

We find the accused guilty of violating DR 5-105, DR 6-101(A)(3) and DR 6-101(A)(1). This opinion will serve as a public reprimand. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).