Argued and submitted February 10, complaint of
Oregon State Bar dismissed June 7, 1983

In re: Complaint as to the conduct of

KIM L. JORDAN,
*Accused.*

(OSB 81-3, SC 28972)

665 P2d 341

Patrick Ford, Medford, argued the cause and filed the brief for the Oregon State Bar.

R. P. Joe Smith, Portland, argued the case and filed the brief for the accused.

Before Campbell, Presiding Justice, and Roberts, Carson and Jones, Justices.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed a single charge complaint against Kim L. Jordan accusing him of unethical conduct for the violation of DR 1-102(A)(4).[1] The gravamen of the complaint is that Jordan on February 9, 1979, at a hearing in Josephine County, falsely denied under oath that previously on August 28, 1978, he had a conversation with one Earl Best and had observed "bus seats that had been slashed." Both parties at all stages of this case have referred to the charge as alleged "false swearing."

This case is a sequel to *In re Jordan,* 290 Or 303, 290 Or 669, 622 P2d 297, 624 P2d 1074 (1981), in which this court upon review of the record from the Commission on Judicial Fitness removed Jordan from his office as a district judge of Josephine County. The first of the seven charges in the judicial fitness case was based upon some of the general facts and a part of the same incident as is the sole charge in this case.[2] This Court in the previous case found Jordan guilty of several charges including the first charge of false swearing. 290 Or at 315.

The Oregon State Bar contends that Jordan is collaterally estopped by the previous action from denying false

---

[1]

"DR 1.102 Misconduct.

　"(A) A lawyer shall not:

　"* * * * *

　"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

[2] The first charge in the complaint before the Judicial Fitness Commission alleged:

　"On * * * 28 August 1978, Judge Jordan had a conversation with * * * Earl Best in the county parking lot concerning the slashing of seats in a county bus * * *. At a subsequent hearing * * * on 9 February 1979, Judge Jordan denied under oath that the conversation with Earl Best in the parking lot on 28 August 1978 ever took place."

The Bar in this case essentially realleged the above *plus* allegations to the effect that on August 28, 1978 Jordan also observed the bus seats had been slashed and that he denied under oath on February 9, 1979 he had ever seen the slashed bus seats.

Jordan in this case has never claimed that the issue in the first cause of complaint in the judicial fitness proceedings and the issue in the Oregon State Bar's complaint were not identical.

swearing in this action and therefore the only issue before this court should be the question of the proper sanction.

A three-day hearing was held before the Trial Board. That Board found that Jordan was collaterally estopped to deny the charge of false swearing and thus guilty of the charge. It further held:

"* * * the findings of the Trial Board, *but for the issue of collateral estoppel, would be entirely favorable to the accused.*" (Emphasis in original)

The Trial Board recommended no punishment or probation be given to Jordan.

The six-member Disciplinary Review Board concurred in the findings of the Trial Board and recommended no sanction on the theory *In re Jordan, supra,* constitutes a public reprimand.

We find that collateral estoppel does not apply and therefore it is necessary to consider the merits of the case. From our independent review of the evidence, we find the Oregon State Bar has not proved the complaint against Jordan by clear and convincing evidence.

Many of the background facts of this case are not disputed. Josephine County had a work program for county jail prisoners called the "Trailblazers." The prisoners in the program were transported from and to jail each workday in a particular bus assigned for that purpose.

On Monday, August 28, 1978, at approximately 8:00 a.m., Robert Daniel Templeton reported to Earl Best, the Director of Corrections for Josephine County, that some seats in the bus had been slashed and that a canteen belonging to the county had been thrown out of the bus window. Best immediately reported the matter to Deputy Lasater of the Sheriff's Department. Sometime before 9:00 a.m. on the same date while Lasater was taking photographs of the damage, several county employees looked at the bus in the county parking lot adjoining the courthouse.

As a result of the investigation, county jail inmates Felix Baldwin and Kent Hawkins were charged with the crime of criminal mischief for slashing the bus seats. Inmate Larry

Smith was charged with second degree theft for throwing the canteen out the bus window.

On August 29, 1978, Baldwin, Hawkins and Smith appeared in District Court before Judge Jordan without counsel and were arraigned and entered pleas of guilty. On that date Baldwin and Hawkins were sentenced to serve one year in the county jail. Two days later, after Jordan received a presentence report, Smith was also sentenced to serve one year. All sentences were concurrent to previous sentences on which each defendant had served several months. The net result was that each defendant was sentenced to the Josephine County jail for substantial additional time.

Sometime later Baldwin, Hawkins and Smith each obtained lawyers and moved to have the guilty pleas set aside. L. A. Cushing, another district judge, vacated the guilty pleas.[3]

On February 1, 1979, a Grants Pass newspaper published an article which accused Best and Jordan of using false inducements to get Baldwin, Hawkins, and Smith to enter their guilty pleas. The headline of the story read: "Prisoners 'Tricked' into Pleading Guilty."

On February 9, 1979, a hearing was held at the Josephine County Courthouse to determine if Earl Best was to continue as the Director of Corrections for the county. Best's attorney objected to Jordan participating as a "decision maker." Jordan was agreeable to stepping aside and the hearing continued before Cushing as the only judge. During the hearing, Jordan was sworn as a witness and testified. At the conclusion of the hearing, Earl Best was discharged.

It is Jordan's testimony at the Februry 9th hearing that gives rise to the charge of false swearing alleged in the complaint in this case. Before we examine the merits of the complaint, it is necessary for us to consider the question of collateral estoppel.

---

[3] We do not know the exact date on which Baldwin and Hawkins pleas were vacated, but the court file of the case of *State of Oregon v. Larry Wayne Smith* is part of the record and it contains an order dated November 6, 1978 vacating the previous guilty plea.

## COLLATERAL ESTOPPEL

This court's opinion in the judicial fitness case, *In re Jordan, supra,* is dated January 7, 1981. The Oregon State Bar filed its complaint in the current case on July 28, 1981. It contained no allegation of collateral estoppel. The hearing before the three-member Trial Board began December 17, 1981.

On the first morning of the hearing, counsel for the Bar submitted a trial brief. The first part of this brief listed the witnesses the Bar planned to present, and their expected testimony. The final portion of this brief mentioned the doctrines of res judicata[4] and collateral estoppel for the first time during this case:

### "RES ADJUDICATA/COLLATERAL ESTOPPEL

"The Oregon Supreme Court held that the accused falsely denied under oath the event occurring at the Trail Blazer bus in *In re Jordan,* 290 Or 303, 622 P2d, 297 (1981). The Oregon State Bar contends that by virtue of this holding the issue of false swearing has already been adjudicated and the Trial Board is precluded from making a contrary finding. In the alternative, the accused should be collaterally estopped to deny the false swearing in this proceeding.

" 'The Oregon State Bar does not contend, however, that the finding by the Supreme Court is binding upon the Trial Board on the issue of fitness to practice law since the earlier determination was solely as fitness to serve as a judge. The interlocking doctrines are raised solely upon the question of fact as to whether or not a false swearing occurred.' "

Counsel for the Bar did not raise the issue of the application of the doctrines of collateral estoppel or res judicata at the beginning of the hearing. After the Bar rested, following a half-day of testimony, the Trial Board reminded counsel for the Bar that these issues had been raised in its brief. The Bar counsel asked the Trial Board to take judicial notice of our decision that resulted in Jordan's removal from the bench. The Trial Board did so. Bar counsel said that he was not ready to argue these questions yet. After the noon recess,

---

[4] Although the Oregon State Bar in its trial brief mentions both res judicata and collateral estoppel, in its subsequent briefs it confined its arguments to collateral estoppel and does not again refer to res judicata.

the Trial Board heard brief arguments on whether collateral estoppel should apply and reserved ruling on the question.

On the morning of the third and last day of the hearing, counsel for Jordan provided the Trial Board with a copy of the complaint and answer filed with the Judicial Fitness Committee. Later that day, the Board ruled that it would allow the Bar to amend its pleadings orally by interlineation to include collateral estoppel, adding to a paragraph:

> "The accused is collaterally estopped by virtue of the Supreme Court decision in the complaint as to the conduct of the Honorable Kim L. Jordan - whatever the cite is - from denying that the false swearing described in the within complaint occurred."

The Board at that time said that it would allow Jordan to present evidence later concerning the fairness of the Judicial Fitness Committee hearing and the availability of the alleged new evidence.

Following the hearing, Jordan moved the Trial Board to reconsider its decision on the application of collateral estoppel. He also requested permission to amend his answer in view of the assertion of collateral estoppel and for a further hearing on the question of the fairness of the Judicial Fitness Committee hearing and the availability of the alleged new evidence. The Trial Board denied this motion and the request for a further hearing.

The Trial Board then issued findings of facts, conclusions and recommendations. It found that the doctrine of collateral estoppel applied, and because of the application of this doctrine, it found Jordan guilty of false swearing.

Jordan claims four errors: (1) the Trial Board's grant of permission to amend the complaint; (2) its refusal to reconsider the question of collateral estoppel; (3) its finding that it was bound by collateral estoppel; and (4) its refusal of a hearing at which Jordan could argue that the evidence presented in the second hearing was new evidence and that the first hearing, in front of the Judicial Fitness Commission, was not fair. By way of argument to support the assignments of error, he claims that collateral estoppel should never apply in a Bar disciplinary hearing; that even if it may be applied, it must be pleaded; and that even if it were properly pleaded and applied,

it was not fair in these circumstances. He also contends that the rationale of the doctrine of collateral estoppel is not served in this case.

The Bar argues that it did not use the doctrine to preclude any evidence because there are two separate decisions to be made: whether Jordan is guilty or not, and if he is guilty, what the appropriate sanction should be. It also contends that collateral estoppel was proper in the present case in order to promote uniformity in decisions. It argues that uniformity is important for consistency and to prevent embarrassment to a court.

■ We agree with Jordan that collateral estoppel should not have been applied in the present case, although we have indicated previously that collateral estoppel may be used in Bar disciplinary proceedings against an accused in some circumstances. *In re Gygi,* 273 Or 443, 541 P2d 1392 (1975).

The initial inquiry in deciding if collateral estoppel is applicable is whether the issues are identical and whether a particular issue was actually decided. *State Farm v. Century Home,* 275 Or 97, 104, 550 P2d 1185 (1976). In the present case, the issues were substantially identical; that is, whether the accused committed false swearing about the August 28, 1978 parking lot incident at a hearing held on February 9, 1979. Although the transcript of the Judicial Fitness Commission hearing is not in evidence, we are able to ascertain from our opinion that this issue was actually decided in the previous case. *In re Jordan,* 290 Or 303, 314-315, 622 P2d 297 (1981).

In *Century Home,* we said:

> "Once the court has concluded that the evidence is sufficient to establish that an identical issue was actually decided in a previous action, 'prima facie the first judgment should be conclusive.' *Bahler v. Fletcher,* [257 Or, 1, 20, 474 P2d 329 (1970)] * * *. The burden then shifts to the party against whom estoppel is sought to bring to the court's attention circumstances indicating the absence of a full and fair opportunity to contest the issue in the first action or other considerations which would make the application of preclusion unfair. Whether the proffered circumstances and considerations warrant a conclusion that the litigant lacked a 'full and fair' opportunity to litigate the issue and that it would be otherwise 'unfair' to preclude him from contesting the issue again

are likewise questions of law. Collateral estoppel involves a policy judgment balancing the interests of an individual litigant against the interests of the administration of justice, and this court reserves the final word as to where the balance is struck in any given case." *State Farm v. Century Home, supra,* 275 Or at 105.

■■ Jordan argues that the Trial Board should have denied the Bar's motion to amend its pleadings to include collateral estoppel, and that even if the amendments were permissible , he should have had an opportunity to present evidence on the question of whether there was newly available evidence and on the fairness of the initial hearing. We note that the Rules of Procedure, section 36[5] suggests that amendments should be freely allowed, and that section 37[6] indicates that technical conformity to the rules of pleading shall not be required. If Jordan had been given an opportunity for a hearing on the new issues raised by the amendments, which alleged the applicability of collateral estoppel, then there would have been no error in allowing this amendment.[7] However, in the present case, he was not given that opportunity. For this reason, we hold that collateral estoppel may not be applied in this case.

[5]

"Section 36. Amendments. (Effective September 21, 1976) A complaint (statement of objections) may be amended at any time to set forth additional facts, whether occurring before or after commencement of the investigation or trial, either in amplification of the original charge or charges or to add new charges. In case of such amendment, the accused (applicant) shall be given a reasonable time, to be fixed by the trial board to answer the amended complaint (statement of objections), to procure evidence and to defend against the charges. The trial board may, at any time, allow or require other amendments to the complaint (statement of objections) or to the answer and may direct or allow the submission of briefs."

[6]

"Section 37. Informalities. (Effective September 21, 1976) Informalities in a complaint, statement of objections, notice to answer or in procedure shall be disregarded. Procedure before a trial board shall conform generally to the usual procedure on a reference in equity. Technical conformity to the rules of pleading of evidence shall not be required. No finding, recommendation, order, decision or determination made in a disciplinary, admission or reinstatement proceeding shall be invalidated on the ground of error in the admission or rejection of evidence, or in pleading, or in procedure, or upon any other ground, unless, on the whole record and evidence, error which resulted, or would result, in a miscarriage of justice has occurred."

[7] We can see no reason why the initial complaint should not have contained this allegation.

■    If the Bar had fulfilled the requirments for the application of this doctrine, it is still not certain that it should have been applied to the present case. The Bar argues that the reason for the doctrine is to ensure uniformity of decisions. They cite no support for this proposition, and it is contrary to the rationale as accepted by this court. As we stated in *Bahler v. Fletcher,* 257 Or 1, 6, 474 P2d 329 (1970), the doctrine is based upon two considerations: the protection of litigants against the harassing necessity of litigating more than once the same issue and the protection of the public's interest in preventing relitigation of matters once decided. The Bar did not litigate the first proceeding, so the first consideration cannot apply in the present case. The public's interest in preventing religitation is also not in consideration in this case, because both sides presented all the available evidence on whether the false swearing occurred, just as though there had been no previous hearing. The application of collateral estoppel in this case would not result in a conservation of the court's resources. Thus, neither goal of collateral estoppel would have been served by allowing the application of the doctrine in this case.

From a fairness standpoint, the accused must know what issue will be litigated at the hearing. The issue raised by the complaint is whether Jordan, at the February 9, 1979 hearing, falsely swore concerning the incident in the bus parking lot on August 28, 1978. That was the issue on which the Bar presented evidence. It was the issue anticipated by Jordan. If the Bar had pleaded collateral estoppel in its complaint, then Jordan and the Bar would not have been presenting evidence about what happened on either of these dates, but as a preliminary matter would have presented evidence on the issue of the applicability of collateral estoppel.

Because this lack of notice of the issues to be litigated was not cured by a later hearing on the issues raised by the allegation that collateral estoppel should be applied, the doctrine cannot be applied.

## ON THE MERITS OF THE COMPLAINT

For this court to find Jordan guilty of false swearing as alleged in the complaint, the Bar must prove by clear and convincing evidence: (1) that on August 28, 1978, Jordan had a

conversation with Earl Best in the county parking lot adjacent to the Josephine County Courthouse concerning the slashing of seats on a county bus by inmates of the county jail and that during the course of the conversation, he observed the bus seats had been slashed, and (2) that on February 9, 1979, at a hearing before Judge Cushing concerning the conduct of Earl Best, the Accused, Jordan, denied under oath that he had such a conversation with Earl Best on August 28, 1978, and further denied that he had ever seen the slashed bus seats.

To prove the first allegation described above, the Oregon State Bar called four witnesses: Carl Lasater, Earl Best, William Gragg, and Marie Hill.

Lasater testified that between 8:30 and 9:00 a.m. on August 28, 1978, he was in the Josephine County parking lot investigating and taking photos of the slashed bus seats. Lasater was employed as an investigator for the sheriff's office. He recalled that Earl Best and a bus driver for the county were present while he was taking the photos, but had no recollection of seeing Jordan there.

Earl Best, on August 28, 1978, was Director of Corrections for Josephine County. He testified that on that date, while Lasater was photographing the bus seats, Jordan arrived at the scene. Jordan came over "to find out what was going on" and "he wanted to see the damage that was done and we [Best and Jordan] stepped up on the back of the bus and we looked in." Best identified only Lasater as being present at the same time as Jordan. Best also testified that Don Moore and Bill Gragg were at the scene but could not pinpoint the time.

William Gragg, on August 28, 1978, was the Security Supervisor for the work release program for Josephine County. He testified that during the investigation Lasater was taking photos of the damage to the county bus when Jordan arrived. Gragg testified as follows:

"Q.   * * * [W]hat did Judge Jordan do and what conversation did he have on that occasion?

"A.   To my recollection, Mr. Lasater was on the rear of the bus on the bumper either looking through the window or attempting to take pictures through the window when Judge Jordan arrived. He walked over and asked what was going on.

"* * * * *

"Q. Did anybody answer him?

"A. Mr. Best stated there had been some damage to the bus. Judge Jordan asked if there were any suspects. Earl (Best) stated, Yes, we know who did it.' Judge Jordan asked if a complaint was going to be filed and Earl stated, 'yes, we will file.' At that point—I'm not sure whether Judge Jordan indicated that the defendants would be brought into his courtroom or whether Earl said, 'I want to get them into your courtroom.' * * * Judge Jordan asked if the Probation Department had a recommendation and Mr. Best replied, Maximum.' "

"Q. * * * Did Judge Jordan make any inspection of the bus for damage to the bus?

"A. When he first arrived I believe he stood on the rear bumper of the bus and looked inside. I don't recall him going in the bus."

On cross-examination, William Gragg was asked the following questions and gave the following answers:

"Q. * * * Is it fair to say that you pride yourself in being able to remember details? * * * "A. I know that my memory is more than outstanding than anyone else. * * * "Q. Do you remember what Judge Jordan was wearing? * * * "A. I recall the shirt that he was wearing. * * * "Q. Would you describe the shirt? * * * "A. It was a white shirt with blue stripes running up and down."

Gragg also testified that the shirt had short sleeves.

Marie Hill, on August 28, 1978, was a probation officer for the Corrections Services of Josephine County. Her supervisor was Earl Best. She testified that Best told her to prepare the presentence report on Larry Smith, but "he had already talked to the judge" and the recommendation was to be that Smith receive a maximum sentence. Hill testified on cross-examination that Best's statements about conversations with judges were very often exaggerations.

To prove the second above-described allegation that Jordan denied under oath that he had a conversation with Earl Best and had further denied ever seeing the slashed bus seats, the Bar introduced a transcript of the February 9, 1979 hearing before Judge Cushing.

Jordan's position is that he did not have a conversation with Earl Best at the parking lot or observe the slashed

bus seats on August 28, 1978, and therefore his testimony at the February 9, 1979 hearing was truthful.[8]

At the hearing before the Trial Board, Jordan called 38 witnesses.[9] This total included 30 character witnesses, who represented a cross-section of the community. All the character witnesses in effect testified that Jordan's reputation for truth and veracity in the community was excellent.

Jordan testified that the first time that he knew he was being accused of meeting with Earl Best in the county parking lot concerning the bus seat slashing was at a Grand Jury hearing on June 14, 1979. Jordan further testified that until he underwent hypnosis on May 22, 1981, he could not remember the events of the morning of August 28, 1978. His testimony was as follows:

"Q. As a result of that experience [hypnosis], did you gain a present memory of going to work on Monday, August 28, 1978?

"A. Yes, I did.

"Q. Do you still enjoy that memory?

"A. Yes, I do.

"Q. What did happen insofar as you participated in the parking lot on Monday, August 28, in the morning?

"A. Nothing.

"Q. Describe what you did, the last few minutes before you

---

[8] Jordan's amended answer contends that the Oregon State Bar's complaint fails to allege that on February 9, 1979, Jordan had a present recollection of the incident alleged to have happened on August 28, 1978. Jordan's testimony seems to abandon that theory of defense. On cross-examination, Jordan testified in this case as to the purport of his testimony at the February 9, 1979 hearing, as follows:

"Q. [Bar counsel] Well, I would just—I was trying to get the form of denial straight in my mind. Would you agree with me if a person says I don't remember. And my question is: Is that the sort of denial you're making?

"A. [Jordan] No, that was not the sort of denial I was making at that time.

"* * * * *

"Q. And the denial on February 9th was absolute also?

"A. Yes. Now, perhaps the best way to have asked that is, was I saying on February 9th I don't remember that, but it could have happened and the answer is that is absolutely not what I was saying."

[9] As the triers of fact under our independent review of the evidence we remind ourselves that we do not count the witnesses but weigh the evidence. ORS 10.095(2)

left home, until you got to your office.

"A.   I assisted my wife in carrying her material to the car and helped her load it and then we both left home at the same time. I had a 9:00 o'clock appointment on that day and I drove to the courthouse and parked in my parking spot and walked then from my car in the back door of the courthouse, which is shown on the drawing alongside the ramp. [At this point Jordan's lawyer asked him to draw a line on a map which had been received as an exhibit showing the path he took to his office. The line drawn by Jordan on the exhibit does not come close to the spot where the county bus was located as described by the testimony of other witnesses.]

"* * * * *

"Q.   Do you recall whether or not you were on time for your 9:00 o'clock appointment?

"A.   I was pretty close, if not on time, pretty close. No more than a few minutes late—if late at all.

"Q.   How long a drive is it from your house to the courthouse?

"A.   Eight, ten minutes."

Marge Jordan, the wife of Kim Jordan, testified that she could remember the morning of August 28, 1978 because she was in charge of a "major meeting" at 10:00 o'clock at her church. This was the first and last time that she was ever in charge of that type of a meeting. The date, but not the time, of the meeting is verified by a program of the event received in evidence. She testified that she had 150 folders in boxes and some posters to take and that her husband helped her put them in her car. They left their home at the same time—8:45 to 9:00, "running late." She stopped and picked up a woman by the name of Stanger and arrived at the church at 9:15 to 9:20. Her husband arrived at the church "a few minutes" late, after the 9:30 prayer meeting, and appeared on the program which was scheduled to start at 10:00. Mrs. Jordan testified that Jordan always wore a white shirt when he was "functioning" at church and that on the morning of August 28th she would have noticed "if he were wearing a striped shirt."

Viola Stanger testified that on the morning in question, Marge Jordan picked her up between 9:05 and 9:15. She also testified that she remembered Jordan participating in the church program that morning and she would remember if he was not wearing a white shirt. Florence Lawrence is a member

of the same church as the Jordans. She testified that on the morning of August 28, 1978, Marge Jordan arrived at the church at approximately 9:15 to 9:20. The inference to be drawn from both women's testimony is that they were nervous and impatient because Marge Jordan was late and they had to hurry to finish their preliminary work for the 10:00 o'clock program prior to a 9:30 prayer meeting.

James D. Moore testified that on August 28, 1978, he was the Trailblazers' crew foreman. Earl Best told him of the damage to the bus seats. He was present at the time Lasater took the photographs but did not see Jordan.[10] He saw Jordan later that morning in a hallway inside the courthouse.

Robert Daniel Templeton testified that on August 28, 1978, he was the Trailblazers' crew jailer. A member of the crew reported the damage of the bus to him. He submitted the original report of the damage to Earl Best. He went out into the parking lot with Best, Gragg, and Moore to see the damage. He saw Lasater taking pictures, but did not see Jordan.

## CONCLUSION

■■■ This court makes its own independent review of the evidence. *In re Robeson,* 293 Or 610, 629, 652 P2d 336 (1982). The proceedings are neither criminal nor civil but sui generis. ORS 9.535(6). The accused is entitled to a presumption that he is innocent of the charge. *In re Galton,* 289 Or 565, 579, 615 P2d 317 (1980). The charges must be proved by clear and convincing evidence. *In re Chambers,* 292 Or 670, 672, 642 P2d 286 (1982). "Clear and convincing evidence means that the truth of the facts asserted is highly probable." *Supove et al v. Densmoor et ux,* 225 Or 365, 372, 358 P2d 510 (1961).

■■■ We find that the Bar has not proved the allegations of its complaint by clear and convincing evidence. In other words, we do not find that the evidence produced by the Bar is "highly probable."

Earl Best's testimony at times was equivocal. He acknowledged before the Trial Board that an answer that he had given on October 17, 1981, was correct:

---

[10] Moore is the only person to appear in any of the photographs taken by Lasater. James D. Moore is the same person referred to by Earl Best as "Don Moore" and is probably the same person referred to by Deputy Lasater as a bus driver for the county.

"Q. [D]id he [Jordan] spend very much time therè [at the parking lot on August 28] at all?

"A. [W]ell, I don't think he spent much time. Because when this question was first asked me, I couldn't recall at first, and I was asked and reasked and reasked and it suddenly dawned on me, yes."

Although Earl Best was not discharged from his position with Josephine County by Jordan, Best's lawyer at the February 9, 1979 hearing did object to Jordan participating in the "decision making" because "his career is also in question." It could be argued that Best had a "sour grapes" motive in testifying later at the Jordan hearing.

If the testimony of Earl Best is discounted then the only direct evidence left in the record which could be a basis of finding Jordan guilty is the testimony of William Gragg. On August 28, 1978, he was employed by Josephine County as the security supervisor of the work release program. He was still employed by the county as a probation officer at the date of Jordan's hearing before the Trial Board. There is no apparent motive for Gragg to give incorrect testimony. As far as the record is concerned, he had nothing to gain or lose by his testimony. Even so, Gragg's statement that his memory is more outstanding than anyone else's and his recall months later that Jordan was wearing a blue and white shirt makes his entire testimony suspect.

The testimony of Gragg and the testimony of Jordan are in direct conflict. They cannot both be correct.

Both Earl Best and William Gragg testified that Lasater was taking photographs of the damage to the bus seats when Jordan arrived in the parking lot. Therefore, from Jordan's standpoint, it was important to establish that time. Lasater testified that his best approximation of the time of the photography was: "Between 8:30 and 9:00 o'clock. But I have no way of knowing." Gragg testified that the picture taking took: "Maybe 10 minutes" and that it was shortly after 8:00. James D. Moore, the foreman, testified that the pictures were being taken at "almost exactly 8:00." Templeton testified he saw Lasater taking the photos and at 8:30 the suspects were being interviewed—the inference being that the photos were taken prior to that time. Best was not asked what time Lasater took the photos of the damage to the bus seats.

The inference from the testimony of the Accused and Marge Jordan is that on the morning of August 28, 1978, Jordan was at home until about 8:45 and did not arrive at the courthouse until 9:00 and therefore he could not have been in the parking lot while Lasater was taking the photographs.

There is a sharp conflict in the testimony of Marge Jordan and William Gragg in two areas. Gragg claims that Jordan was in the courthouse parking lot between approximately 8:00 and 8:10. Marge Jordan contends that her husband left their home between 8:45 and 9:00 and therefore would not arrive at the courthouse until 8:55 to 9:10. The other area of conflict is the color of shirt that Jordan was wearing on the morning in question. The only way the color of the shirt can be reconciled is to assume that Jordan wore a blue and white striped shirt to work and then changed to a white shirt before he attended the church program at 10:00 o'clock.

The fact that Jordan claims his memory was restored by hypnosis is not conclusive to the determination of this case. The psychologist who conducted the hypnosis testified before the Trial Board. The hypnosis procedure was recorded on video tape as required by ORS 136.675 and was received into evidence as an exhibit. We have reviewed both the testimony of the psychologist and the video tape. The questions by the psychologist to Jordan during the hypnosis accept as a given fact that the church program of Marge Jordan was on August 28, 1978. This is probably necessary because the questions have to start from some basis and the date of the church program is not contested. This evidence was not convincing one way or the other.

This case boils down to the question: Do we believe the testimony of Kim L. Jordan or William Gragg? Jordan's testimony has better corroboration. Gragg has no apparent motive to give incorrect testimony. Neither factor is conclusive. In a matter as serious as this where a lawyer's right to practice law is at stake, we reaffirm our previous policy of requiring the Bar to prove its case by clear and convincing evidence. *In re Thomas,* 294 Or 505, 521, 659 P2d 960 (1983). In this case, the Bar's proof does not rise to that standard. We can find no key in the Bar's evidence that leads us to a conclusion as to the truth of the matter in question. In addition to the burden of proof, we have taken into consideration: (1) Jordan

is presumed to be innocent, *In re Galton, supra,* and (2) the Trial Board's determination of the fact questions after having heard and seen the witnesses. *In re J. Kelly Farris,* 229 Or 209, 367 P2d 387 (1961).

This court in a false swearing case said:

· "The trial committee that heard the witnesses 'is better qualified to determine disputed questions of fact than we who read the cold, printed record', and while its determination 'is not conclusive, it must, in the very nature of things, be entitled to respect.' " *In re Moynihan,* 166 Or 200, 221, 111 P2d 96 (1941).

We realize that the result in this case is different than the result we reached in the previous case, *In re Jordan, supra.* The transcript from the hearing before the Judicial Fitness Commission in the previous case was not offered as evidence in this case. However, we can tell from comparing the opinion in the previous case with the transcript of the evidence in this case that we have a different ball game. As far as we can tell, Marge Jordan, Viola Stanger, Florence Lawrence, James D. Moore, Robert Daniel Templeton and the psycholgist did not testify at the first trial. There is no indication that any character witnesses testified at the first trial either. As opposed to this case, Jordan testified that he had "no current recollection" of the August 28, 1978 incident.[11]

The Bar in its argument on collateral estoppel claimed uniformity in decisions is important to prevent embarrassment to a court. As we previously pointed out in this opinion, that is not a proper reason to allow collateral estoppel. We are not embarrassed because we have reached a different result in this case. The evidence presented in this case is substantially different. It calls for a different result. Any attempt to save a court embarrassment has no place in our system. If a

---

[11] Also at the previous hearing, Jordan testified that he had "no reason whatever to question Gragg's veracity about what he felt occurred." He also testified at the same hearing that Bill Gragg "is generally regarded as being a truthful person," and that "it may have happened." 290 Or at 311.

In this case Jordan's position is that his memory has been restored by hypnosis and therefore he now has a current recollection of the August 28, 1978 incident.

Jordan made no comment about Gragg's veracity in this case, but the inference to be drawn from his testimony is that Gragg is not truthful.

court makes a mistake then it is important to correct the mistake as soon as possible. This is not that case. The result in the judicial fitness case was justified by the evidence presented. We are not backing away from the result in that case. This is not a petition for rehearing. Here the evidence presented was different and calls for a different result.

The Oregon State Bar's complaint is dismissed. Costs to neither party.