Argued and submitted January 31, accused suspended for one year July 23, 1985

In re Complaint as to the Conduct of

# DAVID L. MOORE,
*Accused.*

## (SC S30904; OSB 82-63)
703 P2d 961

Lee S. Werdell, Medford, argued the cause and filed the brief for Accused.

Walter L. Cauble, Grants Pass, argued the cause and filed the brief for the Oregon State Bar. With him on the brief was Philip L. Nelson, Grants Pass.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed a complaint against David L. Moore accusing him of unethical conduct in five separate causes. All the causes arise, directly or indirectly, from Moore's alleged representation of clients in connection with the negotiation and purchase of the corporate stock of Pinnacle Packing Corporation, Inc.

The Bar's complaint is dated January 11, 1983, and Moore accepted service of it on January 31, 1983.[1] The Trial Board found Moore guilty of all causes and recommended that he be disbarred. The four member Disciplinary Review Board found that the Trial Board's opinion was "thorough, reasonable and accurate," but recommended that Moore be suspended from the practice of law for a period of three years. We find Moore guilty of all five causes and suspend him from the practice of law for a period of one year.

In 1979, the First National Bank of Oregon as testamentary trustee and executor wanted to sell all the corporate stock of the Pinnacle Packing Corporation, Inc. The assets of the corporation included real estate in downtown Medford, a packing plant and more than 1,000 acres of orchards. Early in that year, a group of investors headed by Cecilia Hardwick began negotiating with the bank. The proposed purchase of the packing company was to be made by Vanya Corporation of which Hardwick was president. Vanya was a corporate shell without assets. Hardwick's equity in a Medford motel was to be used as her contribution to finance the purchase of Pinnacle Packing.

In the late summer of 1979, Charles L. McLaughlin joined the Hardwick group that was attempting to purchase the packing company. He gave the joint venture financial strength. He was a successful real estate developer from California. McLaughlin advanced the sum of $50,000 to the trust account of an Ashland lawyer to be used as the earnest money for the proposed purchase. It was agreed by the group that McLaughlin was to have 60 percent of the ownership and

---

[1] Chapter 618 of Oregon Laws 1983 made substantial changes in the laws relating to the procedure for the discipline of attorneys. However, that chapter provides that any proceedings pending under the former statutes on January 1, 1984, shall be completed as provided in the former statutes.

that after the purchase was completed at least a portion of the orchard property was to be transferred to his individual name. On October 1, 1979, the bank's main office in Portland received the $50,000 as part of an offer from Vanya to purchase Pinnacle Packing.

On October 5, 1979, another member of the group, John Lisac, contacted Moore and requested that he help them "put the Pinnacle deal together."[2] Lisac was a real estate agent who had the property listed for sale. He was going to use the real estate commission as his contribution toward the purchase of the packing company.

On October 10, 1979, Vanya Corporation, through Hardwick as president, submitted a new offer to the bank to purchase all of the outstanding stock of Pinnacle Packing for the sum of $2,750,000 to be paid as follows: (1) earnest money in the amount of $50,000; (2) a first mortgage on Hardwick's Cedar Lodge Motel in the sum of $900,000; and (3) the balance of $1,800,000 to be paid in cash on closing.

In late October 1979, Moore had several meetings with Hardwick, Lisac and Hardwick's husband. Then on October 30, 1979, Moore traveled to Portland with Lisac and Hardwick and met with the bank officers. As a result of that meeting, the bank wrote a letter to "C. C. Hardwick, Individually and President of Vanya Corp., and David Moore, Attorney," confirming its intention to accept the previous offer submitted by Hardwick, subject to certain conditions.

During November 1979, Moore met with Hardwick, Lisac and McLaughlin several times but was unable to complete the transaction and the bank extended its previous deadlines. At a meeting on November 8, Moore told the group that his contingent fee for the completion of the transaction would be $250,000.

On December 1, 1979, Hardwick delivered to Moore a check payable to him in the sum of $5,000. The check was drawn on Mineral Extraction Corp., a corporation owned by Hardwick and her husband. Later, Hardwick claimed that the

---

[2] Moore had worked with Lisac in previous years with other groups of investors who were interested in buying the Pinnacle Packing property. Moore is also a Certified Public Accountant.

$5,000 was a loan and Moore claimed that it was in partial payment of his legal fees.

Around December 10, 1979, Moore made a trip to Palm Springs, California to meet with McLaughlin, his banker, and his accountant. Arrangements were then made for Moore and McLaughlin to meet with the First National Bank officers in Portland in the near future.

On December 14, 1979, Moore and McLaughlin traveled to Portland without Hardwick. Moore introduced McLaughlin to the bankers as a person "with a substantial balance sheet and ability to handle the transaction." At that meeting, McLaughlin informed the bank that the $50,000 that had been tendered previously with the offer from Vanya was his money and not Hardwick's. Moore delivered to the bank a letter signed by him as "Attorney for Celia L. Hardwick" purporting to assign the $50,000 to Charles L.McLaughlin. The letter read in part:

> "The assignment of the above funds eliminates all rights and interests that were held by Mrs. Cecilia L. Hardwick, individually and as President of Vanya Corporation and assigns any and all rights, if any, to Charles L. McLaughlin, of Palm Springs, California.
>
> "An assignment of the interest signed by Cecilia L. Hardwick will be sent to you next week."

Two days later, when Moore returned to Medford, he asked Hardwick to execute the assignment of the $50,000 to McLaughlin. Hardwick refused.[3]

At the meeting on December 14, 1979, the bank learned for the first time that the purchase was to be made by JJ & L Properties, Inc., instead of Vanya Corporation. JJ & L was represented to be another shell corporation which Moore had incorporated during prior negotiations to purchase Pinnacle Packing. McLaughlin became its president and Lisac the vice-president. Although Moore refused an offer

---

[3] Moore testified that Hardwick said: "* * * it wasn't anybody's goddamned business whose $50,000 it was. And that her Polish grandmother told her that she shouldn't sign any documents."

The problem of the $50,000 was eventually solved by the bank returning the money to the Ashland lawyer who had sent it to the bank in the first place. The Ashland attorney then gave the money back to McLaughlin.

from McLaughlin to acquire a beneficial interest in the transaction, he did become the secretary and a director of JJ & L.

On January 28, 1980, the First National Bank, as trustee and executor, entered into an agreement whereby JJ & L agreed to purchase all the common stock of Pinnacle Packing. The purchase was made possible by a loan from Connecticut General Life Insurance Company in the amount of $1,800,000. As part of the same transaction the shareholders of JJ & L were required to execute an agreement in favor of the bank by which they individually guaranteed performance by JJ & L in amounts exceeding one million dollars.

McLaughlin and Lisac offered Hardwick a 20 percent interest in JJ & L if she would execute the guaranty agreement. Hardwick refused.

On October 30, 1980, McLaughlin mailed Moore a check payable to him in the amount of $35,000. Later Moore claimed that the $35,000 was an advance on his legal fees and McLaughlin claimed that it was a loan.

This story does not have a happy ending. JJ & L ended up in a Chapter 11 proceeding in the bankruptcy court. Connecticut General foreclosed its mortgage. Hardwick and McLaughlin made separate complaints to the Oregon State Bar accusing Moore of unethical conduct. Those complaints led to this proceeding. Hardwick has filed a civil action against both Moore and McLaughlin in the Jackson County Circuit Court. McLaughlin has filed a civil action against Moore in the same court.

## FIRST CAUSE OF COMPLAINT

The Bar in this cause of complaint in effect alleges that Moore, by attempting to represent Hardwick, Vanya Corporation, McLaughlin, JJ & L Properties and Lisac at the same time, was representing multiple clients without the necessary consent and disclosure in violation of:

"DR 5-105 Refusing to Accept or Continue Employment if the Interest of Another Client May Impair the Independent Judgment of the Lawyer.

"(A)  A lawyer shall decline proffered employment if the

exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B)   A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

"(C)   In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

Moore's answer to this cause is that he was representing the group purchasing Pinnacle Packing and not the individuals. On January 11, 1980, he wrote to McLaughlin, Hardwick and Lisac and in part said:

"It would appear from my recent discussions with each one of you that there is some disagreement as to the ownership percentage of the purchasing entity.

*"Just so there is no misunderstanding, I want it clearly understood that I represent the group purchasing Pinnacle Packing Company, not any one of you individually."* (Emphasis in original.)

The statements in Moore's letter do not square with the facts. As previously noted in this opinion, on December 14, 1979, Moore signed a letter addressed to the bank as "Attorney for Cecilia L. Hardwick" in a matter concerning other members of the group. On more than one occasion Moore sent statements for services rendered in connection with the purchase of Pinnacle Packing to Hardwick, McLaughlin or Lisac as individuals. The record discloses that Hardwick considered Moore as "her attorney" and was looking to him to protect her individual interest.

The Disciplinary Review Board observed:

"* * * that what [Moore] apparently did in this case was 'follow the money.' He began with what was reasonably perceived by his client, Mrs. Hardwick, to be her attorney and

switched over to what was reasonably perceived by Mr. McLaughlin to be his attorney while professing at the same time to be the attorney for none of them and only the attorney to insure the successful acquisition of the joint venture."

The above observation is correct. On October 30, 1979, Moore and Hardwick, who was president of Vanya Corporation, met with the bank officers in Portland concerning the purchase of Pinnacle Packing. On December 14, 1979, Moore was back in the same office in Portland with McLaughlin and switched the purchaser to JJ & L Properties without the knowledge or consent of Hardwick but at the same time purporting to be "Attorney for Celia L. Hardwick."

Moore's letter of January 11, 1980, claiming to represent only the group purchasing Pinnacle Packing, came too late. The damage was already done. Which group was Moore representing—Vanya Corporation or JJ & L Properties?

DR 5-105(C) does not apply to this situation because Moore did not make a "full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each client." There was no consent by Hardwick, McLaughlin and Lisac to Moore's multiple representation.

We find Moore guilty of the first cause of complaint.

## SECOND CAUSE OF COMPLAINT

In this cause of complaint, the Bar alleges that on December 1, 1979, Moore borrowed the sum of $5,000 from Hardwick and thereby violated:

"DR 5-104 Limiting Business Relations with a Client.

"(A)  A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

Moore admits receiving the money, but claims that it was in payment of legal fees due him.

This is a question of fact. Both the Trial Board and the Disciplinary Review Board found that the transaction was a loan. Although we make our own independent review of the

record, we consider the findings of the Trial Board to help us determine the credibility of witnesses. *In re Samuels/Weiner,* 296 Or 224, 226, 674 P2d 1166 (1984).[4]

Prior to December 1, 1979, Moore had done some legal work for Hardwick that was separate and apart from the purchase of Pinnacle Packing. The balance due on this separate legal work was less than $5,000.

Hardwick testified that on December 1, 1979, she invited Moore and his wife to lunch at the Cedar Lodge Motel. When they arrived, Moore asked Hardwick to loan him $5,000 for a few days. He said he needed the money to make a trip to Palm Springs. Hardwick's husband and Fred Hensley[5] testified before the Trial Board and corroborated Hardwick's testimony. Moore's wife did not testify.

Hardwick's books showed that she treated the $5,000 as a loan. On January 2, 1980, Moore credited the $5,000 to Hardwick's personal account giving her a credit balance of $1,796.58. On January 30, 1980, he showed the $5,000 as a credit on his fee involving the purchase of the Pinnacle Packing Company.

Moore argues that he previously had told Hardwick, McLaughlin and Lisac that they owed him a $15,000 retainer fee for his legal work on the purchase of Pinnacle Packing and that the $5,000 was merely Hardwick's share of the fee. He also contends that he did not need a loan as demonstrated by the fact that he made several substantial deposits in his bank account during the month of December. The Bar introduced documentary evidence that Moore overdrew his account several times during that month.

We find that Hardwick's version of the advance of

---

[4] *See also In re Carstens,* 297 Or 155, 165, 683 P2d 992 (1984); *In re Jordan,* 295 Or 142, 159, 665 P2d 341 (1983).

This court in *In re Moynihan,* 166 Or 200, 221, 111 P2d 96 (1941), said:

"The trial committee that heard the witnesses 'is better qualified to determine disputed questions of fact that we who read the cold printed record', and while its determination 'is not conclusive, it must, in the every nature of things, be entitled to respect.' "

[5] Fred Hensley was a mutual friend who introduced McLaughlin to Hardwick and thereby got McLaughlin interested in the purchase of Pinnacle Packing. Hensley later claimed a finder's fee.

the $5,000 to Moore is correct. We also find that Hardwick expected Moore to exercise his professional judgment for her protection and that he did not make a full disclosure as to the pitfalls of an unsecured loan. *In re Drake,* 292 Or 704, 642 P2d 296 (1982).

We find that Moore is guilty of the second cause of complaint.

## THIRD CAUSE OF COMPLAINT

The Bar alleges that Moore violated DR 5-104(A) by borrowing $35,000 on October 27, 1980, from McLaughlin. Moore affirmatively alleged in his answer to the Bar's complaint that McLaughlin paid him the $35,000 for legal fees earned, but not yet due. He further alleged that the transaction was "structured as a note" so that McLaughlin could obtain a discount on the balance of the attorney fees. Moore also argued that he was not representing McLaughlin at the time of the transaction.

Again this is a question of fact. On October 24, 1980, Moore wrote to McLaughlin:

"This is to confirm our understanding that you will loan me $35,000 for a term of 90 days which will be repaid at that time together with interest at two points over prime as computed by the Bank of America, Palm Springs Branch.

"In addition, I will provide you with 50 hours of legal services for matters not included with the terms of that certain agreement dated January 31, 1980 * * *.

"I believe this covers our agreement. If you will send a note with the money I will send it back promptly upon receipt."

Moore, on October 27, 1980, did execute and deliver to McLaughlin a promissory note for $35,000 with interest at 16 percent per annum and payable in 90 days. The debt was renewed by another note executed by Moore on January 15, 1981, for $36,130.82 with interest at 23-1/2 percent per annum and payable in 90 days.

The evidence is clear that during this period of time, there was a continuing relationship of attorney and client between Moore and McLaughlin.

In the case of *In re Montgomery,* 292 Or 796, 799, 643

P2d 338 (1982), this court divided DR 5-104(A) into four elements:

> "A lawyer shall not (1) enter into a business transaction with a client if (2) they have differing interests therein and if (3) the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless (4) the client has consented after full disclosure."

Here we find: (1) Moore did enter into a business transaction with a client, McLaughlin; (2) Moore and McLaughlin had different interests—Moore was the debtor and McLaughlin was the creditor; (3) McLaughlin expected Moore to exercise his professional judgment for McLaughlin's protection in the loan transaction; and, (4) Moore did not make a full disclosure and therefore McLaughlin did not have an opportunity to consent. As to the fourth element, the lawyer "has an obligation to tell the client that their interests are adverse and what effects the differing interest may have upon the lawyer's ability to exercise his independent professional judgment." *In re O'Byrne,* 298 Or 535, 549, 694 P2d 955 (1985). "[T]he lawyer must *at least advise* the client to seek independent legal counsel." *In re Bartlett,* 283 Or 486, 496, 584 P2d 296 (1978). (Emphasis in original.) Moore did not make a full disclosure or advise McLaughlin to seek independent professional legal counsel.

We find Moore guilty of the third cause of complaint.

## FOURTH AND FIFTH CAUSES OF COMPLAINT

The fourth cause of complaint alleged that Moore accepted and continued employment as attorney for various investors associated with the purchase of Pinnacle Packing notwithstanding the fact he had borrowed money from Hardwick and that his fee for handling the purchase was $250,000. The fifth cause of action is similar except that it alleges Moore borrowed money from McLaughlin.

Both the fourth and fifth causes allege that Moore's conduct violated:

> "DR 5-101 Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment.
>
> "(A)     Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf

of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

Moore argues that the allegations in the Bar's charges contained in the fourth and fifth causes of complaint read in terms of accepting and *"continuing employment"* while DR 5-101(A) speaks only to the acceptance of employment. (Emphasis in Moore's brief in this court.)

Moore correctly refers to the wording of the rule. However, under Canon Five (A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client) the Ethical Considerations in part provide:

"EC 5-2 * * * After accepting employment, a lawyer carefully should refrain from acquiring a property right or assuming a position that would tend to make his judgment less protective of the interests of his client.

"EC 5-3 * * * After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client. * * *."

■■ We recognize that Ethical Considerations are not a part of the Disciplinary Rules and that a lawyer cannot be disciplined for violating them. *In re Tonkon,* 292 Or 660, 664, 642 P2d 660 (1982). However, they are available to aid us in determining the intent of the rules. *In re Brown,* 298 Or 285, 291, 692 P2d 107 (1984). We hold that DR 5-101(A) includes continued as well as initial acceptance of employment if the exercise of the lawyer's professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.

It could be argued that being an obligor on a loan to a lawyer from a client is not a financial, business, property or personal interest within the meaning of DR 5-101(A). This court answered that argument in the case of *In re Drake,* 292 Or 704, 716, 642 P2d 296 (1982):

"Although DR 5-101(A) may well have a primary reference to other financial, business, property or personal interests of the lawyer, the existence of a debt between the lawyer and client may, and in this case did, constitute such an interest

and had an effect upon the lawyer's ability to exercise independent professional judgment incident to the loan transaction itself."

■    Here, the debts between Moore as the lawyer and Hardwick and McLaughlin as the clients did constitute a personal interest which may have reasonably affected Moore's ability to exercise independent professional judgment incident to the loan transactions. Also, at the time of each loan, Moore was representing multiple clients in the same purchase of the packing company. This combination may have reasonably caused Moore to prefer one of the clients over the others.

As a separate prong of both the fourth and fifth causes of complaint, the Bar has alleged that Moore's fee for the handling of the purchase of Pinnacle Packing was the sum of $250,000. It argues that because this was an extraordinarily high legal fee contingent upon the successful conclusion of the purchase, Moore's personal financial interest in the transaction affected his professional judgment. Therefore, the Bar claims Moore violated DR 5-101(A).

The Trial Board made a finding that Moore's "professional judgment reasonably may have been impaired due to the extended fee agreement and loan from McLaughlin." It also commented:

"While we do not believe that a large contingency fee in and of itself is improper in any respect, it does seem to have here affected Mr. Moore's ability to represent the group, particularly exasperated by the existence of the loan [from] McLaughlin, who was at least potentially liable for a part of the fee."

The Disciplinary Review Board made similar observations as to the contingency fee arrangement.

We find Moore guilty of the fourth and fifth causes of complaint. We make this finding because when Moore borrowed money from Hardwick and McLaughlin, it could have reasonably affected his professional judgment in violation of DR 5-101(A).

■    We find that the contingency fee agreement was not a violation of DR 5-101(A) but was only an aggravating circumstance in this particular case. As a matter of fact, it was an

aggravating circumstance which contributed to the violations of the Disciplinary Rules in all five of the causes of action.

## SANCTION

In the recent case of *In re O'Byrne, supra,* we reviewed cases involving the sanctions for violations of DR 5-101(A) and DR 5-104(A). We also noted *In re Boyer,* 295 Or 624, 669 P2d 326 (1983), which contains a comprehensive list of sanctions previously given by this court in conflict of interest cases under Cannon Five.[6]

Since *In re O'Byrne, supra,* did not involve a violation of DR 5-105 we now that this opportunity to review the sanctions previously imposed by this court for violations of that rule. Those cases and the respective sanctions are in *In re Brandsness* 299 Or 420, 702 P2d 1098 (1985) (Public Reprimand); *In re Baer,* 298 Or 29, 688 P2d 1324 (1984) (60 day suspension—also violated DR 5-101(A) and DR 5-104(A)); *In re Montgomery,* 297 Or 752, 687 P2d 156 (1984) (Public Reprimand); *In re Odman,* 297 Or 744, 687 P2d 153 (1984) (Public Reprimand)—also violated Dr 6-101(A)(3) and DR 6-101(A)(1)); *In re O'Neal,* 297 Or 258, 683 P2d 1352 (1984) (Public Reprimand); *In re Thorp,* 296 Or 666, 679 P2d 857 (1984) (Public Reprimand); *In re Boyer,* 295 Or 624, 669 P2d 326 (1983) (seven months suspension—also violated DR 5-101(A)); *In re Jans,* 295 Or 289, 666 P2d 830 (1983) (30 day suspension); *In re Hill,* 295 Or 71, 663 P2d 764 (1983) (Public Reprimand); *In re Jayne,* 295 Or 16, 663 P2d 405 (1983) (Public Reprimand—also violated DR 4-101); *In re Robertson,* 290 Or 639, 624 P2d 603 (1981) (30 day suspension); *In re Holmes,* 290 Or 173, 619 P2d 1284 (1980) (Public Reprimand); *In re Hershberger,* 288 Or 559, 606 P2d 623 (1980) (Public Reprimand plus reimbursement of client's attorney fees to other lawyers in the amount of $290); *In re Mumford,* 285 Or 559, 591 P2d 1377 (1979) (Public Reprimand); *In re Porter,* 283 Or 517, 584 P2d 744 (1978) (Public Reprimand); *In re Banks,* 283 Or 459, 584 P2d 284 (1978) (Public Reprimand); *In*

---

[6] As to "conflicts of interest" generally *see* Tongue, *Oregon "Conflict of Interest" Cases under the 1970 Code of Professional Responsibility,* 20 Will L Rev 391 (1984) and Denecke, *Compexities of Modern Practice Require Changes in Oregon Ethics Code,* 19 Will L Rev 621 (1983).

*re Boivin,* 271 Or 419, 533 P2d 171 (1975) (Public Reprimand).[7]

The review of the sanctions imposed for violations of DR 5-105 corroborates the conclusion we drew in *In re O'Byrne, supra,* from our review of the sanctions imposed for the violations of DR 5-101(A) and DR 5-104(A). Our conclusion was this court has drawn a line between (1) case in which the lawyer is guilty only of a conflict of interest, and (2) cases in which the conflict was aggravated by fraud, dishonesty, or misappropriation of funds. We noted that in the former class of cases, the sanctions have been a public reprimand or a suspension for less than one year. In the latter class of cases, the suspensions have exceeded one year and one case resulted in disbarment.[8] *In re O'Byrne, supra,* 298 Or at 551. We cannot find by clear and convincing evidence that Moore is guilty of fraud or dishonesty. Misappropriation of funds is not involved. However, because this case has many aggravating circumstances, we order that Moore be suspended from the practice of law for a period of one year. The Oregon State Bar is awarded costs. ORS 9.536(4).

---

[7] The only case, other than the case at bar, that we can find in which the accused lawyer was also found guilty of violating DR 5-101(A), DR 5-104(A) and DR 5-105 is *In re Baer,* 298 Or 29, 688 P2d 1324 (1984). We ordered that Baer be "suspended from the practice of law for not less than 60 days beginning on November 1, 1984, and thereafter until he has taken and successfully completed the professional responsibility examination."

[8] We noted in *In re Boyer,* 295 Or 624, 630, 669 P2d 326 (1983), that conflict of interest cases appear to be on the increase and that "more severe penalties for this kind of unprofessional conduct" may be imposed for acts which occur in the future. *Boyer* was published on September 20, 1983. The acts in this case occurred in 1979 and 1980.